1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **ROBERT S. MARKMAN,** | ) | **NO. CV 15-3335-DDP (KS)** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **REPORT AND RECOMMENDATION OF** |
| | ) | **UNITED STATES MAGISTRATE JUDGE** |
| **RACHEL LASOTA, et al,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

        This Report and Recommendation is submitted to the Honorable Dean D. Pregerson, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order No. 05-07 of the United States District Court for the Central District of California.

## INTRODUCTION

        On May 4, 2015, Robert S. Markman ("Plaintiff"), a California resident proceeding *pro se*, filed a civil rights complaint pursuant to 42 U.S.C. § 1983 ("Complaint"). The then-named defendants filed motions to dismiss. (Dkt. Nos. 22, 35.) On May 27, 2017, the Court granted the motions to dismiss and ordered Plaintiff to file an amended complaint. (Dkt. No. 64.) On June 16, 2016, Plaintiff filed a First Amended Complaint (Dkt. No. 65), and on July

1

6, 2016, pursuant to a stipulation of the parties (Dkt. No. 67), Plaintiff filed a Second Amended Complaint (Dkt. No. 69).  On July 20, 2016, the defendants filed a motion to dismiss the fourth cause of action in Plaintiff's Second Amended Complaint (Dkt. No. 72), which the Court granted on August 16, 2016 (Dkt. No. 77).  On September 20, 2016, Defendants Rachel LaSota, California Highway Patrol ("CHP") Officer D. Keene, CHP Officer Jeremy Tolen, and CHP Sergeant Waughan (together, "Defendants") filed Answers to the Second Amended Complaint.  (Dkt. Nos. 80-83.)  On September 27, 2016, the Court granted the parties' stipulations to dismiss two defendants.  (Dkt. No. 86.)[1]

On May 23, 2017, Defendants filed a Motion for Summary Judgment Or In The Alternative Summary Adjudication as to Plaintiff's Second Amended Complaint (the "Motion"), along with a [Proposed] Statement of Uncontroverted Facts and Conclusions of Law ("SUF") in support of the Motion (Dkt. No. 94), and a Request for Judicial Notice ("RJN") (Dkt. No. 95).  On September 5, 2017, Plaintiff filed an Opposition to the Motion ("Opposition") (Dkt. No. 111), Plaintiff's Statement of Genuine Disputes in Opposition to the Motion (Dkt. No. 112), and the Declaration of Robert Markman with related exhibits ("Markman Decl.") (Dkt. No. 113).

On September 20, 2017, Defendants Keene, Tolen, and Waughan filed a Reply in Support of the Motion, Objections to the Markman Declaration, and the Declaration of Gary Ostrick.  (Dkt. No. 117.)  On September 21, 2017 Defendant LaSota filed a separate Reply in Support of the Motion, with a Declaration of Gary Ostrick, a Request for Judicial Notice, and Objections to Plaintiff's Evidence.  (Dkt. No. 119.)  The Motion is now fully briefed and ready for decision without oral argument. For the reasons set forth below, the undersigned recommends that the Motion be GRANTED as to all Defendants.

---

[1] The Court dismissed physicians Clint Salo, D.O. and J. Kellogg M.D. from this action with prejudice.  (Dkt. No. 86.)

1

## ALLEGATIONS OF THE SECOND AMENDED COMPLAINT

2

3          The Second Amended Complaint ("SAC")[2] alleges the following:

4

5          Plaintiff is a former doctor of medicine.  (SAC ¶ 11.)  On December 23, 2013, the

6   Medical Board of California restricted Plaintiff's license to practice medicine and required

7   him to attend quarterly probation interviews at the Medical Board's probation unit.  (SAC ¶

8   11.)  The probation officers assigned to Plaintiff, including Defendant LaSota, required that

9   Plaintiff be frisked for weapons when he arrived at the probation unit for his quarterly

10  interviews.  (SAC ¶ 12.)  Plaintiff was frisked at his first interview without incident.  (*Id.*)

11

12         Between the first and second quarterly probation interviews, Plaintiff injured his left

13  shoulder.  (SAC ¶ 13.)  On March 25, 2014, when Plaintiff appeared at the probation unit for

14  his second quarterly interview Plaintiff informed the security guard that he could not put his

15  left arm behind his back in a particular position because of the shoulder injury.  (*Id.*)  The

16  security guard "grabbed Plaintiff's left arm, pulled it behind [Plaintiff's] back and violently

17  forced it upwards."  (*Id.*)  When Plaintiff pulled away in pain, the security guard threw

18  Plaintiff to the floor, causing Plaintiff to sustain additional injury to his left shoulder.  (*Id.*)

19  The security agent then ordered Plaintiff to stand facing a wall with his hands in front of him

20  touching the wall, and he was frisked without further incident.  (SAC ¶ 13.)

21

22         Three days after that second quarterly interview, Plaintiff sought medical treatment

23  due to unrelenting left shoulder pain.  (SAC ¶ 14.)  Plaintiff was diagnosed with a partially

24  torn left rotator cuff and commenced treatment.  (*Id.*)  After the first injection, Plaintiff

25  developed a large hematoma over his left shoulder.  (*Id.*)

26

27

28  [2]   As amended by the Court's August 16, 2016 and September 27, 2016 Orders. (Dkt. Nos. 77, 86.)

3

On May 6, 2014, Plaintiff was instructed to report to the probation unit on May 29, 2014 for his third quarterly interview. (SAC ¶ 15.) On May 12, 2014, Plaintiff emailed probation officer Dianna Gharibian and stated that he would only come for the interview if she and Defendant LaSota, his other probation officer, could guarantee that he would not suffer additional injury at the hands of the security guards. (SAC ¶ 16.) Plaintiff did not receive a response. (SAC ¶ 18.)

On May 27, 2014, two days before the scheduled interview, Plaintiff telephoned Gharibian. (SAC ¶ 19.) Gharibian insisted that Plaintiff attend his interview and submit to a search and frisk by security personnel. (*Id.*) Plaintiff stated that he would come but only if he could bring along an observer to videotape the search. (*Id.*)

On May 28, 2014, Plaintiff telephoned Defendant LaSota. (SAC ¶ 25.) Defendant LaSota stated that Plaintiff must attend the interview and submit to a search and frisk and could not bring along an observer. (SAC ¶ 26.) Plaintiff offered to undergo a strip search to avoid "another violent frisking procedure." (*Id.*) Defendant LaSota stated that this was not an acceptable solution. (*Id.*) Plaintiff then suggested that he come to the interview naked so that no search would be necessary. (SAC ¶ 27.) Defendant LaSota responded, "Fine, we'll see you in the morning." (*Id.*)

On May 29, 2014, Plaintiff arrived for his 10:00 am interview "wearing only his boxer briefs" and carrying a long-tailed shirt. (SAC ¶ 28.) Plaintiff asked at the reception window for Defendant LaSota but was informed by the receptionist that Defendant LaSota would not see him because he was not dressed appropriately. (SAC ¶ 28.) Plaintiff stated that he would stay in the waiting room until 10:45 am and then leave. (SAC ¶ 29.) Plaintiff overheard a discussion among staff indicating that Defendant LaSota had called the CHP to have Plaintiff removed. (*Id.*) Plaintiff decided to leave. (*Id.*) He put on his shirt and took an elevator down to the lobby. (*Id.*) Defendant Waughan, having been called by Defendant

4

LaSota to assist her in detaining Plaintiff, was waiting for him in the lobby.  (*Id.*)  Defendant Waughan instructed Plaintiff to "put some clothes on."  (*Id.*)  Plaintiff responded, "I have clothes on."  (*Id.*)  Plaintiff exited the building and began walking through the parking lot.  (*Id.*)  Defendant Waughan followed Plaintiff and told Plaintiff that he was detaining him.  (SAC ¶ 29.)  Defendant Waughan ordered Plaintiff to sit down on a curb in the parking lot.  (*Id.*)  "With no reasonable suspicion or probable cause," Defendant Waughan detained Plaintiff in the parking lot at Defendant LaSota's request.  (SAC ¶ 29; *see also id.* at ¶ 37.)  Plaintiff demonstrated his inability to place his left arm behind him in a raised position.  (*Id.*)

Defendants Tolen and Keene arrived, spoke with Defendant LaSota, then told Plaintiff to stand up and turn around, handcuffed Plaintiff with his hands behind his back – despite Plaintiff's protests of pain – and placed Plaintiff in a patrol car.  (SAC ¶ 29-30.)  Plaintiff had "tried to tell Defendants Tolen and Keene that he could not place his left arm behind his back without further injuring his shoulder," but Defendants Tolen and Keene grabbed him, threatened to Tase him, and then handcuffed Plaintiff's hands behind his back.  (SAC ¶ 33.)  Defendant Tolen removed Plaintiff's car keys from Plaintiff's shirt pocket and several officers searched Plaintiff's car.  (SAC ¶ 30.)

Defendants Tolen and LaSota spoke some more.  (SAC ¶ 31.)  Defendant Keene and Tolen then drove Plaintiff to College Hospital, where Defendant Tolen filled out an application for 72 hour detention for evaluation and treatment ("5150 application").  (*Id.*)  The information Defendant Tolen provided on the 5150 application reflected statements Defendant LaSota had made to him as well as additional information that Defendant Tolen added.  (*Id.*)  Defendants Tolen and LaSota had also spoken about Plaintiff "weeks before the incident."  (SAC ¶ 31.)  The information Defendant Tolen provided on the 5150 application was false and both he and Defendant LaSota knew it was false.  (*Id.*; *see also* SAC at 13, ¶ 34.)  Defendant Tolen had seen documents refuting what Defendant LaSota had told him, but nevertheless repeated her statements on the 5150 application.  (SAC ¶ 31.)

5

The following  information that Defendant LaSota gave to Defendant Tolen and that Defendant Tolen then provided on the 5150 application was false:  (1) Plaintiff was mentally ill; (2) Plaintiff attacked two LAPD officers, hospitalized them, and attacked a social worker; (3) Plaintiff is known to sleep in bed with his adult daughter after drugging her with propofol; (4) Plaintiff was uncooperative when he appeared for his interview; and (5) Plaintiff "stated that he would come to his interview with the only gun God gave him." (SAC ¶ 35.)  Based on the information on the 5150 application, Plaintiff was involuntarily confined at College Hospital for 72 hours.  (SAC ¶ 31.)  Other false information that Plaintiff alleges Defendant Tolen provided on the 5150 application included that:  (1) Plaintiff showed up for a "psych eval/hearing"; (2) Defendant Tolen had personal knowledge of Plaintiff; (3) Plaintiff had a documented history of violence; (3) Defendant Tolen was personally aware of Plaintiff's documented history of violence due to an ongoing investigation; (4) the LAPD and social services contacted Plaintiff for injecting his daughter's vagina daily with propofol; (5) Plaintiff is a gravely disabled adult; and (6) Plaintiff is a danger to others.  (SAC ¶ 36.)

Defendant Keene completed a "Narrative/Supplemental" form and stated that the information he provided therein was dictated by Defendant Tolen.  (SAC ¶ 39.)  Plaintiff alleges that all of the statements provided therein are false.  (*Id.*)  Defendant Tolen also prepared an "Arrest-Investigation Report," which reported false information.  (SAC ¶ 40.)  Plaintiff was involuntarily confined based on what was written on the 5150 application prepared by Defendant Tolen and the attached "summary/narrative" prepared by Defendant Keene.  (SAC ¶ 43.)  Defendants Tolen, Keene, Waughan, and LaSota admitted, while testifying under oath in an administrative law hearing, that the allegations they had made against Plaintiff on May 29, 2014 and the actions and statements they attributed to him were false.  (SAC ¶ 45.)

6

Based on these allegations, the SAC asserts seven causes of action. The First Cause of Action alleges that Defendants violated Plaintiff's Fourth and Fourteenth Amendment rights to be free from unreasonable seizures when they caused his detention and involuntary confinement. (SAC ¶¶ 46-49.) The Second Cause of Action alleges that Defendants conspired to violate his right to be free from unreasonable seizures. (SAC ¶¶ 50-52.) In his Third Cause of Action, Plaintiff alleges that Defendants Tolen and Keene used excessive force in detaining, arresting, confining, and incarcerating Plaintiff and in so doing violated Plaintiff's rights under the Fourth and Fourteenth Amendments. (SAC ¶¶ 53-56.) The Fifth,[3] Sixth, Seventh, and Eighth Causes of Action California state tort claims for false imprisonment (SAC ¶¶ 62-64), negligence (SAC ¶¶ 65-67), defamation (SAC ¶¶ 68-71), and intentional infliction of emotional distress (SAC ¶¶ 72-74), respectively.

## DEFENDANTS' CONTENTIONS

Defendants contend that summary judgment, or alternatively, summary adjudication is warranted to dismiss all Plaintiff's claims against each of them or find that Defendants are entitled to qualified immunity. At issue in the Motion is whether triable issues of fact exist such that a reasonable jury could infer from the evidence that Plaintiff can establish: (1) Defendant LaSota violated Plaintiff's Fourth and Fourteenth Amendment rights and is not entitled to qualified immunity for her actions; (2) Defendants Keene, Tolen and Waughan violated Plaintiff's Fourth and Fourteenth Amendment rights because these defendants lacked probable cause to detain Plaintiff pursuant to California Welfare and Institutions Code Section 5151 ("Section 5150 Hold"); (3) Defendants Keene, Tolen, and Waughan used excessive force against Plaintiff; (4) Defendants Keene, Tolen, and Waughan are not entitled to qualified immunity for their actions in connection with Plaintiff's detention under Section

---

[3] The Court dismissed the Fourth Cause of Action for deliberate indifference to a serious medical need on August 16, 2016. (Dkt. No. 77.) However, for clarity and ease of reference, the Court retains the original numbering of the remaining causes of action.

5150; and (5) Defendants LaSota, Keene, Tolen, and Waughan  are liable for false imprisonment, negligence, defamation and intentional infliction of emotional distress under California law and are not immune from liability under Section 5278 of the California Welfare and Institutions Code and Section 47(b) of the California Civil Code concerning defamation. (Motion at 2-3.)

## STANDARD OF REVIEW

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The party moving for summary judgment bears the initial burden of offering proof of the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party's burden is met, the party opposing the motion is required to go beyond the pleadings and, by the party's own affidavits or by other evidence, designate "specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e); *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  The party opposing the motion must submit evidence sufficient to establish the elements that are essential to that party's case, and for which that party will bear the burden of proof at trial.  *Celotex Corp.*, 477 U.S. at 322.

The Court must "view the facts in the light most favorable to the non-moving party and draw reasonable inferences in favor of that party."  *Scheuring v. Traylor Bros., Inc.*, 476 F.3d 781, 784 (9th Cir. 2007).  Where different ultimate inferences reasonably can be drawn, summary judgment is inappropriate.  *Miller*, 454 F.3d at 988.  "At the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence."  *Porter v. California Dep't of Corrections*, 419 F.3d 885, 891 (9th Cir. 2005) (citation omitted).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis upon

which a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" only if it might affect the outcome of the lawsuit under governing law. *Id.*

"Evidence may be offered 'to support or dispute a fact' on summary judgment only if it could be presented in an admissible form at trial." *Southern California Darts Ass'n v. Zaffina*, 762 F.3d 921, 925-26 (9th Cir. 2014) (citing *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003), *cert. denied*, 541 U.S. 937 (2004)) (internal quotations omitted); *see also Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 846 (9th Cir. 2004) ("Even the declarations that do contain hearsay are admissible for summary judgment purposes because they 'could be presented in an admissible form at trial.'") (citations omitted). Purported evidence which "sets out mere speculation for the critical facts, without a showing of foundation in personal knowledge[ ] for the facts claimed to be at issue" is insufficient. *John M. Floyd & Assoc., Inc. v. Tapco Credit Union*, 550 Fed. Appx. 359, 360 (9th Cir. 2013). Conclusory statements are insufficient to defeat summary judgment. *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 950 n.9 (9th Cir. 2011) (en banc), *cert. denied*, 565 U.S. 1200 (2012).

To establish the existence of a factual dispute, the opposing party does not need to establish a material issue of fact conclusively in its favor. It is enough that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (quoting FED. R. CIV. P. 56(e) advisory committee's note on 1963 amendments); *International Union of Bricklayers v. Martin Jaska, Inc.,* 752 F.2d 1401, 1405 (9th Cir.1985).

9

**EVIDENTIARY RULINGS**

1. Defendants Keene, Tolen, and Waughan submitted the following objections to the following portions of and/or exhibits to the Declaration of Robert Markman (Dkt. No. 117-1):

    a. <u>Parag. 4 of Markman Decl. and the related Request for Judicial Notice, Exhibit</u> 8 – a print out of the criminal docket in the California Superior Court action, *People v. Markman*, MBC Case no. 800-2014-0002973. Defendant's hearsay objections under Fed. R. Evid. 801 and 802 are SUSTAINED. The document offered by Plaintiff for the truth of its contents is hearsay, not admissible under any exception, and only the case docket was attached to Markman's declaration, not the affidavit regarding Markman's purported disposition of his firearms. The Court will not consider Plaintiff's assertion about what the docket supposedly contains in opposition to the Motion.

    b. <u>Parag. 4 of Markman Decl</u>. – the assertion that "Defendant LaSota was aware of this declaration in January 2014 because she had obtained the criminal court records . . ." Defendants' objection under Fed. R. Evid. 602 for Plaintiff's lack of personal knowledge is SUSTAINED. The Court will not consider this assertion as admissible evidence in opposition to the Motion.

    c. <u>Parag. 5 of Markman Decl</u>. – Plaintiff's recounting of statements made by Kee Nguyen under cross-examination during a March 2016 Medical Board hearing. Defendants' hearsay objections under Fed. R. Evid. 801 and 802 are SUSTAINED. The offered contents of the testimony by Kee Nguyen are hearsay and are not admissible under any exception. Accordingly, the Court will not consider the Nguyen testimony or Plaintiff's characterization of that testimony in opposition to the Motion.

d. <u>Parag. 9 of Markman Decl</u>. – Plaintiff's assertion that "The statements on the 5150 were interpreted by the admitting nurse at College Hospital to mean . . ." Defendants' objection under Fed. R. Evid. 602 for Plaintiff's lack of personal knowledge is SUSTAINED.

e. <u>Parag. 11 of Markman Decl</u>. – as to the contents of a declaration that Plaintiff maintains he submitted in California State court proceeding, *People v. Markman*, MBC Case no. 800-2014-0002973.  Defendant's hearsay objections under Fed. R. Evid. 801 and 802 are SUSTAINED.  The document offered by Plaintiff for the truth of its contents is hearsay, not admissible under any exception, and was not attached to Markman's declaration, only the case docket.  Accordingly, the Court will not consider the purported evidence in opposition to the Motion.

2. Defendant LaSota, with her Reply to the Motion,  submitted the following Objections to Plaintiff's Evidence (Dkt. No. 119-3):

a. <u>Plaintiff's assertions in Parag. 4 of the Markman Decl.</u> of what "Defendant LaSota was aware of . . ."  For the reasons discussed above with respect to this statement, LaSota's objection under Fed. R. Evid. 602 is SUSTAINED.

b. <u>Plaintiff's assertion in Parag. 5 of the Markman Decl.</u> that "Those court records are part of Defendant's request for Judicial Notice Exhibit 8."  LaSota's objection under Fed. R. Evid. 602 that the statement lacks foundation is OVERRULED. The fact that the records are part of a request for judicial notice is not objectionable.  To the extent that LaSota objects that the purported evidence lacks foundation because the state court docket was not printed until July 2016, under Fed. R. Evid. 201, the Court may take judicial notice of "matters of public record" such court files and records not for the truth of the facts recited therein, but for the existence of the record.  *See e.g., Lee v. City of Los Angeles*, 250 F.3d 668, 690

(9th Cir. 2001) (noting court may take judicial notice of undisputed matters of public record but not disputed facts stated in public records).

c. <u>Parag. 11 of the Markman Decl.</u> that states: "While I was on probation LaSota always had in her file the criminal court docket certifying this information to be correct." LaSota's objection under Fed. R. Evid. 602 that the statement lacks foundation is SUSTAINED. The Court will not consider this statement by Plaintiff as evidence in opposition to the Motion.

## SUMMARY OF UNDISPUTED MATERIAL FACTS

Defendants submitted a [Proposed] Statement of Uncontroverted Facts and Conclusions of Law in support of the Motion ("SUF"). (Dkt. No. 94-13.) With his Opposition, Plaintiff filed a Statement of Genuine Disputes in Opposition to the Motion. (Dkt. No. 112.) After a detailed examination of the parties' submissions, related exhibits, affidavits, and the pleadings, the Court sets forth the following uncontroverted material facts.

### Plaintiff's Background and Medical Board Proceedings

Plaintiff is a retired board-certified anesthesiologist. Currently, Plaintiff's only patient is his adult daughter who lives with him and for whom Plaintiff administered propofol for severe genital pain in a treatment room in their home. (SUF ¶¶ 2-3; RJN Ex. 2.)

On December 21, 2011, Plaintiff was involved in a physical encounter with Los Angeles Police Department officers who were investigating a report to Adult Protective services by a physician at Cedars-Sinai Medical Center about the health and welfare of Plaintiff's daughter. (SUF ¶ 9; RJN, Ex. 9.) Plaintiff was arrested, and on January 6, 2012, a complaint was filed charging Plaintiff with violations of Cal. Penal Code § 148(a)(1) a

1   misdemeanor (resisting and obstructing officer) and Cal. Penal Code § 242/243(b) (battery

2   on a peace officer).  (SUF ¶ 11; RJN Ex. 8.)

3

4       On August 31, 2012, in Los Angeles Superior Court case no. 2SR0041, Plaintiff was

5   found guilty after a jury trial of violating Penal Code § 148 (a)(1) and not guilty of battery

6   on a peace office (Cal Pen. Code § 243).  (RNJ, Ex. 8 at Page ID 286.[4])  Plaintiff was placed

7   on probation for 36 months with conditions, including that he not own, use or possess any

8   dangerous or deadly weapons, and that he submit to search with or without a warrant,

9   probable cause, or reasonable suspicion.  (SUF ¶ 14; RJN, Ex. 8)  Plaintiff appealed the

10  conviction; on September 30, 2013, the Superior Court appellate division affirmed.  (SUF

11  ¶ 13, RJN, Ex. 9.)

12

13      On, April 13, 2012, the Medical Board of California filed an accusation against

14  Plaintiff for:  (1) Gross Negligence with the Inappropriate Administration of Dangerous

15  Drugs; (2) Incompetence with the Inappropriate Administration of Dangerous Drugs, (3)

16  Repeated Negligent Acts with the Inappropriate Administration of Dangerous Drugs, and (4)

17  Failure to Maintain Adequate and Accurate Records.  (SUF ¶ 1.)[5]

18

19      On November 13, 2013, the Medical Board issued a decision placing Plaintiff on a

20  period of probation for 7 years and requiring that Plaintiff be available for in person

21  interviews upon request either at Plaintiff's place of business or at the MBC probation office

22  throughout the period of probation.  (SUF ¶ ¶ 5-6; RJN Ex. 2 at 38-39.)  Plaintiff appealed

23

24

25  [4]      Where documents in the record are not paginated or not consecutively paginated, for ease of reference, the Court
    uses the page identifiers assigned by the CM/ECF docket.
    [5]      Defendants request judicial notice ("RJN")  of  13 administrative , judicial, and public records from the Medical
26  Board of California ("MBC") proceedings in two cases – MBC Case No. 17-2011-21439, *In re Robert S. Markman*, M.D.
    (Exs. 1, 2); and  MBC Case No. 800-2014-0002973, *In re Robert S. Markman, M.D.* (Exs. 10, 11) – and judicial files of
27  the Los Angeles Superior Court, Case No BS146722 (Exs. 2, 3-7), Case No. 2SR00042 (Exs. 8, 9); and Case No. BS
    165118 (Ex.13).  Pursuant to Federal Rule of Evidence 201(b) and (d), Defendants' RJN is granted as to these judicial and
28  administrative records.

the MBC decision in a writ of administrative mandamus filed on January 13, 2014 in the Los Angeles County Superior Court.  (SUF ¶¶ 5, 7, 12; RJN, Exs. 2-4.)

In March 2014, the MBC filed an Accusation against Plaintiff asserting a cause for discipline based on Plaintiff's alleged Incompetence based on Mental Illness.  (SUF ¶ 15; RJN, Ex. 10.)

On May 19, 2015, the Los Angeles County Superior Court set aside the MBC's cause for discipline against Plaintiff for improper administration of controlled substances to a person experiencing pain, sustained the causes for discipline based on negligence, repeated negligent acts, and inadequate medical records, and remanded the matter to the MBC to vacate its administrative decision including the penalty and take further action in accordance with the Superior Court's order.  (RJN Ex. 4.)

On November 16, 2015, the MBC issued a Decision After Remand that imposed the same penalty on Plaintiff, including the term of probation and requirements for compliance with the MBC's probation unit.  (RJN Ex. 5.)  Petitioner again filed a Writ of Mandamus challenging the MBC's Decision After Remand.  (RJN Ex. 5.)  On August 10, 2016, the Los Angeles Superior Court denied Plaintiff's writ of mandate to set aside the November 2015 MBC decision.  (RJN Exs. 6-7.)

On July 18, 2016, based on a Second Amended Accusation, the MBC adopted the Proposed Decision of the administrative law judge to revoke Plaintiff's medical license.  (RJN Exs. 11-12.)  The MBC found that the Cause for Discipline for incompetence based on mental illness was not established by clear and convincing evidence, but the Cause for Discipline based on Plaintiff's criminal conviction for violating Penal Code § 148(a) was established.  (*Id*.)

1
2
3
4
5
6

On December 3, 2013, MBC inspector and probation monitor, Dianna Gharibian, was assigned to serve as the probation monitor for Markman. (SUF ¶ 17.) Gharibian sent a letter to Markman on December 4, 2013, advising him that his probation intake interview would be held on December 13, 2013, at the Cerritos office of the Medical Board. (SUF ¶ 17, Declaration of Dianna Gharibian ("Gharibian Decl.") ¶ 3.)

7

8
9
10
11
12
13

On December 10, 2013, after Gharibian learned that Plaintiff was on criminal probation, she made a request to the Medical Board's Enforcement Program for information on any weapons that Plaintiff possessed and received information from the California Bureau of Firearms' database indicating that Plaintiff had purchased and possessed multiple Beretta semi-automatic pistols. (SUF ¶ 20; Gharibian Decl. ¶ 4; *see also* Declaration of Kee Nguyen ("Nguyen Decl.") ¶ 4.)

14

15
16
17
18
19

Rachel LaSota is probation supervisor for the MBC's Cerritos, Glendale, and Valencia offices. (Declaration of Rachel LaSota ("LaSota Decl.") ¶ 1.) LaSota was not a licensed peace office under California law during 2013 and 2014. (SUF ¶ 69; LaSota Decl. ¶ 3.) Rachel LaSota assigned Inspector Dianna Gharibian to serve as the probation monitor for Plaintiff. (SUF ¶ 17; LaSota Decl. at ¶ 4.)

20

21
22
23
24
25
26
27
28

On December 13, 2013, Gharibian conducted a probation intake interview with Plaintiff at the MBC office. (*See* Gharibian Decl. at ¶ 5.) LaSota was also present at the meeting. (*Id.*; LaSota Decl. at ¶ 7.) Because the MBC's office in Cerritos did not have any regular security guards or metal detectors, it was fairly routine for Nguyen or other investigators to frisk physicians attending meetings with the MBC staff at the Cerritos office if the physicians had backgrounds that showed a potential for violence, such as a criminal conviction, a history of arrests, a record of firearm possession, or a history of combative or hostile behavior. (Nguyen Decl. at ¶ 5.) On December 13, 2013, LaSota

15

asked Investigator Kee Nguyen to frisk Plaintiff for weapons.   (LaSota Decl. ¶ 6; Gharibian Decl. at ¶ 5.)   Nguyen frisked Plaintiff for weapons before his probation interview without incident.  (SUF ¶ 21; Nguyen Decl. at ¶ 5; *see also* SAC ¶ 12.)

**March 2014 Probation Interview**

On March 25, 2014, Gharibian conducted a second probation interview meeting with Plaintiff.  (Gharibian Decl. at ¶ 7.)  Nguyen again frisked Plaintiff for weapons before the probation interview and aggravated an existing injury to Plaintiff's shoulder.  (SUF ¶ 25; Nguyen Decl. at ¶ 8.)  Gharibian found Plaintiff's behavior during the March 2014 probation interview to be rude and uncooperative.  (Gharibian Decl. at ¶ 7.)  Because of Plaintiff's "hostile behavior and negative attitude" during his search and interview on March 25, 2014, Nguyen contacted the CHP Safety Services Program Investigator for the MBC's office. (Nguyen Decl. at ¶ 9.)

Nguyen was trying  to coordinate a probation search of Plaintiff's residence because of the MBC's concern about whether Plaintiff still possessed his firearms or if Plaintiff had relinquished them as required by the terms and conditions of his criminal probation.  (SUF ¶ 24; Nguyen Decl. at ¶ 9.)  On April 2, 2014, Nguyen cancelled the tentative search of Plaintiff's residence after the Los Angeles Police Department ran the information on Plaintiff's firearms and found no information showing that the firearms had been transferred, turned in, or sold.  (SUF ¶ 26; Nguyen Decl. at ¶ 8; LaSota Decl. at ¶ 1; Tolen Decl. at ¶ 45.)

**May 29, 2014 Arrest and 5150 Hold**

In anticipation of Plaintiff's May 2014 probation interview, Gharibian sent an email to California Highway Patrol ("CHP") Officer Jeremy Tolen enclosing documents related to Plaintiff, including:  an email from the Los Angeles County Probation Department providing

16

the terms and conditions of Plaintiff's criminal probation; the December 21, 2011 Arrest Report from the Los Angeles Police Department; a LAPD report regarding criminal threats by Plaintiff toward an Adult Protective Services social worker; and California Department of justice information concerning firearms that Plaintiff possessed.  (SUF ¶ 28; Gharibian Decl. at ¶ 9; Declaration of CHP Officer Jeremy Tolen ("Tolen Decl.") at ¶ 6.)

On April 22, 2014, Officer Tolen met with LaSota to discuss Plaintiff and a physician who was harassing the MBC and its employees.  (SUF ¶ 27; Tolen Decl. at ¶ 4.)  On the same date, Officer Tolen received an email from LaSota asking for a CHP presence at the MBC's office in Cerritos for Plaintiff's upcoming probation interview in May.  (SUF ¶ 27; Tolen Decl. at ¶ 6.)

Before Plaintiff's second probation interview, Plaintiff sustained a left shoulder injury while walking his dog.  (SUF ¶ 25; Declaration of Deputy Attorney General Gary Ostrick ("Ostrick Decl.") at ¶ 3, Ex. N at 37:9-38:12.)

On May 12, 2014, Plaintiff sent an email to Gharibian complaining about having to travel to the MBC office in Cerritos, stating that it was a "punitive measure" that was "extremely dangerous to [Plaintiff's] health."  (SUF ¶ 31; Gharibian Decl. at ¶ 10.)  Plaintiff also complained that he had suffered a "physical assault" by the MBC's "sadistic security guard" and suggested that he would "strip naked" at the next probation meeting to avoid being searched for weapons.  (SUF ¶ 31, Ex. F.)[6]  [Transcript of call to Markman Decl. ¶ 11]

During a telephone call with Plaintiff on May 27, 2014, Gharibian explained to Plaintiff that according to the terms of his criminal probation, Plaintiff was subject to search at any time by a probation officer or a peace officer.  (SUF ¶ 32; Gharibian Decl. at ¶ 11.)

---

[6]       The contents of Plaintiff's email are admissible as party admissions.  Further, Plaintiff has not objected to the admissibility of this material.

Plaintiff indicated that he would not allow himself to be searched again and he would strip naked if he had to show that he did not have any weapons.  (Gharibian Decl. at ¶ 11.)

During a telephone call on May 28, 2014 with LaSota, Plaintiff acknowledged that he was on criminal probation and subject to search of his person and property.  (SUF ¶ 33; Markman Decl. Ex. J.)  However, Plaintiff indicated that he "would have no problem just stripping naked for the, for whoever it is that needs to make sure I don't have weapons." (Markman Decl. Ex. J.)  At the end of the call Plaintiff indicated that he "will simply, um, come there with uh, no clothes on, and then you can decide what to do with me when I get there." (Markman Decl. Ex. J.)  When LaSota spoke with Plaintiff on May 28, 2014, LaSota "was concerned that the California Bureau of Firearms' automated database did not show any record of Plaintiff transferring his weapons to anyone else."  (LaSota Decl. at ¶ 16.)

On May 29, 2014, Plaintiff walked into the MBC's office lobby wearing underwear and, possibly, carrying a short-sleeve dress shirt, but he did not have shoes, socks, or pants with him.  (SUF ¶ 34; Declaration of Marianne Eckhoff ("Eckhoff Decl.") at ¶ 6.)

Because Plaintiff was not appropriately dressed, MBC Supervising Investigator Marianne Eckhoff, a told Plaintiff that the probation interview was cancelled.  (Eckhoff Decl. at ¶ 7.)  Eckhoff did not call the police or the California Highway Patrol because Plaintiff said that someone was coming to pick him up at 10:45 a.m.  (Eckhoff Decl. at ¶ 6.) LaSota also did not call the police, the Los Angeles County Sheriff's Department, or the California Highway Patrol concerning Plaintiff.  (LaSota Decl. at ¶ 19.)

Plaintiff was leaving an elevator in the MBC lobby while being escorted by a building security guard when CHP Sergeant Waughan first saw Plaintiff.  (SUF ¶ 38-39; Declaration of CHP Sergeant Brian Waughan ("Waughan Decl.") at ¶ 5.)  Waughan followed Plaintiff into the parking lot where he detained Plaintiff.  (SUF ¶ 40; Waughan Decl. ¶ 6.)  Waughan

18

1   called the Los Angeles County Sheriff's Department because the lobby and parking lot of
2   the MBC building were under the Sheriff's Department's jurisdiction.  (SUF ¶ 41; Waughan
3   Decl. at ¶ 7.)

4

5   Eckhoff received a telephone call from Investigator Kim Wilson who asked Eckhoff to
6   come downstairs to the parking lot where Plaintiff had been detained.  (SUF ¶ 44; Eckhoff
7   Decl. at ¶ 8.)  When LaSota heard that Plaintiff had been stopped by the CHP in the MBC
8   parking lot, she watched them from her office window.  (LaSota Decl. at ¶ 20.)

9

10   Eckhoff went to LaSota's office and LaSota was asked to go to the MBC parking lot to
11   provide information about Plaintiff's probation.  (SUF ¶ 44; LaSota Decl. at ¶ 20.)  Eckhoff
12   escorted LaSota downstairs to the parking lot because the law enforcement offices in the
13   parking lot had questions about Plaintiff's criminal probation.  (SUF ¶ 44; Eckhoff Decl. at ¶
14   8.)  LaSota took the Medical Board's probation file for Plaintiff and went downstairs to the
15   parking lot.  (LaSota Decl. at ¶ 20.)

16

17   The MBC requested that, Ruben Garcia,  probation monitor,  videotape any encounters
18   with Plaintiff because of a previous incident with him.  (Declaration of Ruben Garcia
19   ("Garcia Decl.") at ¶ 2-3.)  On May 29, 2014, Garcia used an official camcorder to record
20   Plaintiff's conversations with MBC employees when Plaintiff was in the MBC office's
21   lobby.  (*Id.* at ¶ 4.)  Garcia also videotaped Plaintiff's encounters with law enforcement
22   officers and his detention in the parking lot, although Garcia did not videotape Plaintiff
23   continuously.  (*Id.*)  Garcia provided copies of portions of Garcia's video recordings with his
24   declaration.  (*Id.*)

25

26   CHP Officers Tolen and Keene received a call from CHP Sergeant Brian Waughan
27   indicating that Plaintiff was not cooperating with the MBC because Plaintiff had appeared at
28   the MBC wearing only his underwear.  (SUF ¶ 43; Declaration of Officer Daniel Keene

19

("Keene Decl.") at ¶ 4; Tolen Decl. at ¶ 10.)  When Keene and Tolen arrived on the scene, Sergeant Waughan and Plaintiff were in the parking lot, and Plaintiff was sitting on the curb wearing only his underwear and a loose fitting, short-sleeve shirt.  (Keene Decl. at ¶¶ 5-6; Tolen Decl. ¶ 13.)

Officer Tolen, Sergeant Waughan, and Officer Reardon discussed whether to have Plaintiff taken for evaluation by a psychiatrist under California Welfare and Institutions Code § 5150.  (SUF ¶¶ 46, 48; Keene Decl. at ¶ 7; Tolen Decl. at ¶ 14.)  Following their discussions, a decision was reached that Plaintiff should be taken for an evaluation by a psychiatrist to determine whether he met the Section 5150 requirements for a 72-hour hold – that is, whether Plaintiff was gravely disabled or posed a risk of potential harm to himself or others.  (SUF ¶ 48; Tolen Decl. at ¶ 14; Waughan Decl. at ¶¶ 12, 14.)

Once the decision was made to transport Plaintiff to a hospital for a mental evaluation under Section 5150, Plaintiff had to be handcuffed during the transportation process because the CHP patrol vehicle that Officers Tolen and Keene were using did not have a cage, screen, or other divider in between the front and rear seats.  (SUF ¶¶ 48, 70; Keene Decl. ¶ 8; Tolen Decl. ¶ 16.)  According to CHP policy and practices, the CHP officers had to handcuff Plaintiff and place him in the front passenger seat in order to transport him to a hospital. (*Id.*)

Officer Tolen told Plaintiff to stand up and turn around.  (SUF ¶ 57; Keene Decl. at ¶ 9; Tolen Decl. at ¶ 17.)  Officer Tolen took hold of Plaintiff's right arm and put it behind his back.  When Officer Keene moved toward Plaintiff's left arm, Plaintiff spun around and tightened his left arm so that Officer Keene could not move it for handcuffing.  (SUF ¶ 58; Keene Decl. a ¶ 9; Tolen Decl. at ¶ 17; Garcia Decl. at ¶ 4; Ex. A; Ostrick Decl. at ¶ 6.)

1    The law enforcement officers did not ask for LaSota's advice or opinion concerning

2    how to handle, detain, or arrest Plaintiff because LaSota was not a peace officer.  (SUF ¶ 49;

3    LaSota Decl. at ¶ 22.)  LaSota did not make any suggestions or provide any advice or

4    opinions about whether to arrest Plaintiff or have him detained or evaluated under Section

5    5150.  (SUF ¶ 47, 56; LaSota Decl. at *¶ 22;* Waughan Decl. at *¶* 12.)  LaSota did not have

6    any involvement with the handcuffing of Plaintiff, and did not have any involvement with

7    Plaintiff being placed in a CHP patrol vehicle for transportation.  (SUF ¶ 51; LaSota Decl. at

8    ¶ 23-24.)  On May 29, 2014, LaSota had no communication with the physicians or staff at

9    College Hospital Cerritos regarding Plaintiff.  (SUF ¶ 51; LaSota Decl. at ¶ 26.)

11    Officers Tolen and Keene drove Plaintiff to College Hospital Cerritos where the

12    hospital staff took custody of Plaintiff.  (Keene Decl. at ¶ 11.)  Officer Tolen completed the

13    Section 5150 Application.  (SUF ¶ 63; Keene Decl. at ¶ 11; Tolen Decl. at ¶ 21.)  Officer

14    Keene did not complete any part of the Section 5150 Application for Plaintiff's admission to

15    the hospital. (SUF ¶ 63; Keene Decl. at ¶ 11.)

## DISCUSSION

## I.    Seizure and Detention Under Section 5150 (First Cause of Action)

21    In his First Cause of Action, Plaintiff alleges that Defendants violated Plaintiff's rights

22    under the Fourth and Fourteenth Amendments of the United States Constitution because

23    Defendants lacked probable cause to seize Plaintiff on May 29, 2014 and detain him for a

24    psychiatric evaluation pursuant to California Welfare and Institutions Code § 5150.  (SAC ¶¶

25    46-49.)  Defendants move for summary judgment on the grounds that probable cause existed

26    to seize Plaintiff for a Section 5150 mental health evaluation.  (Motion at 9; Reply at 3-9.)

27    \\

28    \\

21

## A. Legal Standard

The Fourth Amendment guarantees an individual's right to be free of unreasonable searches and seizures except upon probable cause.  U.S. CONST. amend. IV.  A warrantless arrest requires probable cause.  *Michigan v. Summers*, 452 U.S. 692, 700 (1981).  When making a probable cause determination, the court must consider the totality of the circumstances known to the arresting officers at the time.  *Illinois v. Gates*, 462, U.S. 213, 238 (1983).  "Probable cause is an objective standard. The arresting officers' subjective intention . . . is immaterial in judging whether their actions were reasonable for Fourth Amendment purposes."  *United States* v. *Lopez,* 482 F.3d 1067, 1072 (9th Cir. 2007) (internal citation omitted).  Officers are permitted to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."  *Hart v. Parks*, 450 F.3d 1059, 1067 (9th Cir. 2006) (internal citations omitted).  "The fact that other inferences are possible does not mean that there is a triable issue of fact as to whether there was probable cause."  *Id.*

In the context of a seizure for psychiatric evaluation, the Ninth Circuit has held "[a]lthough there are few decisions that discuss the fourth amendment standard in the context of seizure of the mentally ill, all have recognized the proposition that such a seizure is analogous to a criminal arrest and must therefore be supported by probable cause."  *See Maag v. Wessler*, 960 F.2d 773, 775 (9th Cir. 1991.)

Under Section 5150 of the California Welfare & Institutions Code, an officer may take into custody for a period of 72 hours for assessment, evaluation, and crisis intervention or placement for evaluation and treatment any person whom the officer determines, "as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled."  CAL. WELF. & INST. CODE § 5150(a).  The officer's determination must be based on

22

probable cause. *Id.* "Probable cause exists under section 5150 if facts are known to the officer 'that would lead a person of ordinary care and prudence to believe, or to entertain a strong suspicion, that the person detained is mentally disordered and is a danger to himself or herself." *Bias v. Moynihan*, 508 F.3d 1212, 1220 (9th Cir. 2007) (quoting *People v. Triplett*, 144 Cal.App.3d 283 (1983)). To justify such a seizure, "the officer must be able to point to 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant his or her belief or suspicion," with each case to be decided "on the facts and circumstances presented to the officer at the time of the detention." *Triplett,* 144 Cal.App.3d at 288 (internal citations omitted); *Bias*, 508 F.3d at 1220.

Moreover, a peace officer "is not required to make a medical diagnosis of mental disorder. It is sufficient if the officer, as a lay person, can articulate behavioral symptoms of mental disorder, either temporary or prolonged." *Triplett,* 144 Cal.App.3d at 288. "[G]enerally, mental disorder might be exhibited if a person's thought processes, as evidenced by words or actions or emotional affect, are bizarre or inappropriate for the circumstances." *Id.*

**B. Analysis**

To prevail on the Motion, Defendants must show that the undisputed material facts demonstrate that the arresting officers had probable cause to detain Plaintiff on May 29, 2014 under Section 5150. Thus, the central issue here is whether the totality of the facts available to the officers objectively provided probable cause to warrant Plaintiff's arrest and transport to a hospital for a mental evaluation. Plaintiff contends the officers lacked probable cause for his detention.

\\

\\

\\

1

2

### 1.  Decision to Detain Plaintiff for Mental Evaluation under Section 5150

3

It is undisputed that on May 29, 2014, Plaintiff appeared at the MBC offices for a probation interview wearing underwear with no pants, shoes or socks,[7] his scheduled probation interview was later cancelled because he was inappropriately dressed, Plaintiff was later arrested in the MBC parking lot, and transported to College Hospital Cerritos where he was subject to a "5150 hold." Almost everything else about what occurred after Plaintiff's arrival at the MBC offices, and why, is disputed.

When CHP Sergeant Brian Waughan first saw Plaintiff on May 29, 2014, he was being escorted out of an elevator by a female building security guard. (Waugh Decl. at ¶ 5.) Sergeant Waughan saw a man wearing underwear, but not wearing any pants, shoes, or socks. (*Id.*) Waughan followed the man and the security guard out of the building, where he observed Plaintiff "walking in the parking lot in his bare feet and underwear, although he had put on a short-sleeve, buttoned shirt." (*Id.* at ¶ 6.) Waughan "was concerned because the man seemed to think that it was appropriate to walk around in his underwear" and as a result, he detained Plaintiff in the parking lot and had Plaintiff sit on a curb. (*Id.*) Waughan then requested that Los Angeles County Sheriff's Department respond to the scene because, although the MBC's office area was under the jurisdiction of the CHP, the MBC lobby and parking lot were under the Sheriff Department's jurisdiction. (*Id.* at ¶¶ 7, 11.)

---

[7]      The parties dispute whether Plaintiff was wearing a short sleeved shirt or simply carrying the shirt. LaSota states that "Markman appeared in the lobby at the Medical Board's office in Cerritos wearing only his underwear." (LaSota Decl. at ¶ 18.)  Plaintiff asserts that he was wearing the short sleeved shirt when he entered the MBC building, but as he entered "the probation office suite itself, [h]e took the shirt off." (Markman Decl. at ¶ 6.)  The Court finds that this disputed fact is not material because under either scenario, Plaintiff does not deny that he was dressed in boxer briefs, without pants, shoes, or socks when he arrived for his probation interview. (*Id.*)  It is beyond dispute that, with or without a shirt, wearing one's underwear to a public facility for a probation interview is not appropriate.

1    In the meantime, while Plaintiff was detained, Waughan spoke with Plaintiff about

2    why he was wearing only his underwear, and Plaintiff explained that he had come to the

3    building wearing only his underwear because he did not want to be frisked.  (Waughan Decl.

4    at ¶ 7.)  Plaintiff also explained that he had been injured when he was previously frisked, so

5    by being naked he could show that he did not have any weapons.  (*Id.*)  Plaintiff told

6    Waughan about his injured shoulder and demonstrated for Waughan that he could put his

7    arms behind his back, but he could not lift his left arm as high as his right arm.  (*Id*. at ¶ 8.)

8    While he was detained, Plaintiff apparently lay on the ground in the parking lot as well as sat

9    on the curb.  (*Id.* at ¶ 9.)

10

11    Waughan called CHP Officer Tolen to the scene because the MBC's office area was

12    under CHP jurisdiction.  (Waughan Decl. at ¶ 11.)  Waughan explained to Tolen that

13    Plaintiff "was not cooperating with the Medical Board because he had appeared at the

14    Medical Board for an evaluation or hearing wearing only his underwear."  (*Id.*)   The

15    Sheriff's deputies on the scene thought that Plaintiff should be arrested for indecent

16    exposure, but Waughan thought that plaintiff "should [be] taken to a psychiatrist pursuant to

17    Welfare and Institutions Code Section 5150 so that he could be evaluated to determine

18    whether he was mentally ill and a danger to himself or others."  (*Id.* at ¶ 12.)

19

20    While Waughan was waiting for Officer Tolen, LaSota came down from the Medical

21    Board office to answer questions regarding Plaintiff's probations status.  (Waughan Decl. at

22    ¶ 13.)  She explained Plaintiff's probation status with the MBC and confirmed that Plaintiff

23    was on probation for a criminal conviction.  (*Id.* at ¶ 13.)  When Tolen arrived with CHP

24    trainee, Keene, Tolen and Waughan discussed whether Plaintiff should be taken for

25    evaluation by a psychiatrist.  (*Id.* at ¶ 14; SUF 48)  Tolen says that when he arrived at the

26    MBC parking lot Plaintiff's "appearance was disheveled, he looked upset to me, and he was

27    unshaven with messy hair."  (*Id*. at ¶ 22.)  Officer Tolen confirms LaSota's assertions that

28    she was not involved in any decision to detain Plaintiff to a psychiatric evaluation, to

transport him to hospital, and was not involved in filling out the application for a section 5150 hold.  (Tolen Decl. at ¶ 19; LaSota Decl. at ¶¶ 24-26; SUF ¶¶ 52-56.)  Plaintiff offers no evidence to the contrary.

According to Waughan, "Officer Tolen decided that Plaintiff should be taken to a hospital under Section 5150."  (Waughan Decl. at ¶ 14.)  Officer Tolen, however, states that "*we* made the decision" to take Plaintiff to the hospital under Section 5150.  (Tolen Decl. at ¶ 17 (emphasis added).)

Pursuant to CHP policy and practices, Plaintiff had to be handcuffed while being transported to a hospital for a mental health evaluation under Section 5150 because the patrol vehicle did not have a cage, screen, or other divider between the front and rear seats.  (Waughan Decl. at ¶ 15.)  Tolen told Plaintiff to stand up and turn around and to put his hands on the back of his head.  (Tolen Decl. at ¶ 17; SUF ¶¶ 57, 58-59.)  Tolen took Plaintiff's right arm and put it behind Plaintiff's back, but when Officer Keenen moved to take Plaintiff's left arm, Plaintiff "spun around" toward Tolen and "held his left arm rigidly against his body."  (Tolen Decl. at ¶ 17.)  Plaintiff explained that he had hurt his left shoulder.  (*Id.*)  Tolen then told Plaintiff, "to relax or I was going to Tase him."  (*Id;* SUF ¶ 59.)  Tolen states that he had to repeat this phrase more than once, but did not take his Taser out of its holster.  (Tolen Decl. at ¶ 17; SUF ¶ 60.)  Plaintiff eventually did relax his arm and Officers Keene and Tolen moved Plaintiff's arms behind his back and handcuffed him.  (Tolen Decl. at ¶ 17; SUF 59.)

At College Hospital Cerritos, Officers Keene and Tolen transferred custody of Plaintiff to the hospital staff.  (Tolen Decl. at ¶ 21.)  Tolen completed a Section 5150 Application for 72-Hour Detention for Evaluation and Treatment.  (*Id.*)  Tolen states that he completed the Application "to the best of my memory based on information that I had either

received by email and reviewed, had reviewed when I was at the Medical Board, or had received verbally from Medical Board employees." (*Id*.)

Tolen states that he made his decision based on the "totality of the circumstances" on May 29, 2014, including Plaintiff's past conduct and character and reputation as well as Plaintiff's inappropriate attire, his disheveled appearance, and Tolen's review of LAPD reports, which stated that Plaintiff had been involved in an altercation with LAPD officers who were conducting a welfare check on Plaintiff's daughter and the altercation resulted in Plaintiff suffering a criminal conviction. (Tolen Decl. at ¶ 22 (a)-(c).) Tolen also states that LAPD reports indicated that Plaintiff had made "death threats to the police officers during the altercation and had made a death threat to an Adult Protective Services social worker who came to his home to check on his daughter's welfare." (*Id*. at ¶ 22(c).)

Tolen states that he was aware that MBC staff had concerns about Plaintiff's "potential for violence" because MBC staff had previously requested a CHP presence at Plaintiff's probation interview meeting. (Tolen Decl. at ¶ 22(d).) Tolen had also seen documentation indicating that Plaintiff had firearms and the LAPD did not have records showing that Plaintiff had sold, transferred, given away, or otherwise disposed of his firearms as required by the terms of his criminal probation." (*Id*. at ¶ 22(e).) Tolen states that he had reviewed both the MBC decision that disciplined Plaintiff and placed him on probation for the unprofessional medical treatment of his daughter, which included administering injections in her genital region and using propofol, and the MBC accusation against Plaintiff for Mental Incompetence Based on Mental Illness. (*Id.* at ¶¶ 22(f), (g).)

\\
\\
\\
\\
\\

### 2.  Plaintiff's Evidence that Defendants Lacked Probable Cause for His Arrest and Section 5150 Hold.

In opposing the Motion, Plaintiff disputes that Defendants Tolen and Keene[8] had probable cause on May 29, 2014 to seize Plaintiff pursuant to Section 5150.  (Opposition at 2-16.)  Specifically, Plaintiff argues that the statements Defendant Tolen wrote on the 5150 Application are false and that documentary evidence available to Tolen on May 29, 2014 refute these statements.  (*Id.* at 3; Markman Decl. at ¶ 14.)  Plaintiff points to Tolen's statement on the 5150 Application that Plaintiff had a "history of violence" and "had attacked police officers" during the altercation at Plaintiff's home and contends that Tolen knew (or should have known), based on the information provided by Kee Nguyen in March 2014, that Plaintiff had only been convicted of resisting arrest and not committing battery on police officers.  (Opposition at 3; Markman Decl. ¶¶ 9, 14, Ex. E.)

Plaintiff also presents the transcript of his May 28, 2014 telephone conversation with LaSota to challenge statements recorded by Officer Keene in the CHP 216 report that Plaintiff had told LaSota he would "come to the interview 'with nothing but the gun God gave to me.'"  (Markman Decl. at ¶ 15; Exs. H (CHP 216 report); J (call transcript).) Plaintiff argues that to establish probable cause for the Section 5150 hold, "Tolen was required by Welfare and Institutional Section 5150-5157 to show that [Plaintiff] had a mental disorder and was either a danger to himself or others or that he was gravely disabled."  (Opposition at 4.)  Plaintiff also points to information in the records that LaSota apparently gave to Tolen in April 2014 (*see* SUF ¶ 27), which indicates that Plaintiff was never charged with making criminal threats in connection with the altercation at his home in 2011, and, on that basis, Plaintiff argues that "Tolen knew at the time of detention that [Plaintiff] had been acquitted of the charge of battery on a peace officer, yet he chose to

---

[8]     As Defendants point out in their Reply, Plaintiff's Opposition offers no evidence regarding Keene's actions and only mentions Keene once, in a heading.  (*See* Reply at 2; Opposition at 1-24.)

28

1   deliberately misrepresent what he knew in order to provide probable cause for the 5150."

2   (Opposition at 7-8.)

3

4       Plaintiff also argues that to the extent Office Tolen relied on historical information to

5   support probable cause for the 5150 hold, that historical information cannot, as a matter of

6   law, support probable cause unless the historical information "concerns 'the historical course

7   of the person's mental disorder.'"  (Opposition at 6 (citing Cal. Welf. & Instit. Code §

8   5150.05(a)).)  Plaintiff argues that none of the historical information that Tolen wrote down

9   as probable cause for the 5150 hold was related to "the historical course of [Plaintiff's]

10  mental disorder" because Plaintiff had never been diagnosed with or treated for a mental

11  disorder."  (*Id.*)  Defendants have presented no evidence indicating that Plaintiff had ever

12  been diagnosed with a mental disorder prior to his detention on May 29, 2014.

13

14          **3.  Summary Judgment is Warranted as to Defendants LaSota, Keene, and**

15              **Waughan on Claim One[9]**

16

17      On this record, there is no triable issue of fact indicating Defendant LaSota

18  participated in the decision detain Plaintiff for psychiatric evaluation, to handcuff him, or

19  transport Plaintiff to the hospital, and there is no evidence that LaSota had any involvement

20  in completing the Application at College Hospital Cerritos for the Section 5150 hold.  (*See*

21  SUF ¶¶ 52-56; 63.)  Indeed, in his Opposition Plaintiff only argues that "Tolen and Keene

22  did not have probable cause" for his seizure pursuant to Section 5150.  (Opposition at 2.)

23  Plaintiff argues that LaSota's "investigation into the status of [Plaintiff's] firearms was

24  contrived" because Plaintiff contends that he had informed MBC personnel since December

25  2013 that he had transferred ownership of the firearms to his daughter and she had removed

26  _____

27  [9]     Because the Court concludes that no evidence supports Plaintiff's First Claim against Defendant LaSota, the
    Court need not reach Defendants' alternative arguments that LaSota had no duty to intervene to prevent Plaintiff's
    unconstitutional seizure (*see* Motion at 12-13) and/or is entitled to qualified immunity against potential liability for this

28  claim (Motion at 13-14).

29

them from his residence.  (*Id.* at 19.)  But even if true, this assertion does not demonstrate how LaSota personally participated in any decision to seize Plaintiff for psychiatric evaluation.  Thus, Plaintiff points to no evidence implicating LaSota in any alleged deprivation of Plaintiff's constitutional rights.  Because Plaintiff fails to present any evidence of LaSota's involvement in the decision to detain Plaintiff under Section 5150, the Motion should be GRANTED as to LaSota on Plaintiff's First Claim.

Likewise, there is no triable issue of fact as to Defendant Keene's liability for either the decision to detain Plaintiff pursuant to Section 5150 or for completing the Application. Keene was a CHP trainee at the time and Officer Tolen was his field training officer. (Keene Decl. at ¶ 3.)  Keene states that because he was a trainee, he did not participate in the decision to take Plaintiff for psychiatric evaluation under Section 5150.  (Keene Decl. at ¶ 7.)  Plaintiff offers no evidence to the contrary.

While Plaintiff argues in his Opposition that Tolen and Keene did not have probable cause to seize Plaintiff, Plaintiff offers no evidence that Keene had any personal involvement in the decision to detain Plaintiff or that Keene was involved in completing the 5150 Application.  (*See* SUF ¶ 62.)  Officer Tolen states that during the discussions in the MBC parking lot about whether to have Plaintiff taken for a psychiatric evaluation, "Officer Keene observed because he was in training."  (Tolen Decl. at ¶ 14.)  Further, Plaintiff has submitted no evidence to indicate that Keene had any knowledge of information about Plaintiff's prior MBC disciplinary proceedings, the 2011 altercation at Plaintiff's home, his subsequent conviction for resisting arrest and criminal probation status, or the MBC's second disciplinary proceeding that alleged Plaintiff's mental incompetence.  To the contrary, Plaintiff asserts that LaSota provided all of that information to Tolen, not Keene.  (*See* Opposition at 9-10.)

Indeed, Plaintiff's Opposition does not mention any conduct by Officer Keene whatsoever. The Opposition is dedicated almost exclusively to refuting the statements Officer Tolen made on the 5150 Application. (*See e.g.,* Opposition at 3-16.) Further, while Plaintiff complains that information in the CHP 216 report is false (*see* Markman Decl. at ¶ 16, Ex. H), Plaintiff states that the assertions in that CHP 216 report were "*Tolen's* assertions, recorded by Keene." (*Id.* at ¶ 15 (emphasis added).) Plaintiff presents no evidence to raise a reasonable inference that Keene should have known that any of that information was false. In fact, Plaintiff's only assertion regarding Keene's individual participation in the events surrounding Plaintiff's detention on May 29, 2014 is his assertion that Keene wrote the CHP 216 report. Because Plaintiff fails to present any admissible evidence that Keene was involved in either the decision to detain Plaintiff under Section 5150 or completing the 5150 Application at College Hospital Cerritos, the Motion should be GRANTED as to Keene on Plaintiff's First Claim for unlawful seizure and detention pursuant to Section 5150.

Finally, CHP Sergeant Waughan acknowledges that he called "for the Sheriff's Department to respond to the scene" at the MBC offices on May 29, 2014 and in discussions with the Sheriff's Department deputies, Waughan expressed the view that Plaintiff "should be taken to a psychiatrist" pursuant to Section 5150. (Waughan Decl. at ¶ 14.) However, Waughan states that "Officer Tolen decided that [Plaintiff] should be taken to a hospital under Section 5150." (*Id.*) Officer Tolen similarly states that he had a "brief discussion" with Sergeant Waughan and Officer Reardon about whether to take Plaintiff for evaluation under Section 5150 and "we reached a decision" to transport Plaintiff for psychiatric evaluation. (Tolen Decl. at ¶ 14.) Although Sergeant Waughan expressed the view that Plaintiff should be taken for a psychiatric evaluation, there is no evidence that Sergeant Waughan had any role in handcuffing Plaintiff, transporting Plaintiff to College Hospital Cerritos, or completing the 5150 Application. (*See generally id.*) In opposing the Motion, Plaintiff also presents no probative evidence indicating Sergeant Waughan's liability for any

31

violation of Plaintiff's rights under the Fourth or Fourteenth Amendment.  Accordingly, the Motion should be GRANTED as to Sergeant Waughan on Plaintiff's First Claim.

### 4.  Defendant Tolen is Entitled to Summary Judgment On Claim One

Evaluating whether Officer Tolen's decision to detain Plaintiff for psychiatric evaluation meets the objective standard for probable cause, based on the "totality of the circumstances" at the time of the detention is a closer call.  Defendants argue that summary judgment is warranted on Plaintiff's First Cause of Action (unreasonable seizure) because the officers had probable cause to detain Plaintiff for psychiatric evaluation based on his inappropriate attire, disheveled appearance, his prior arrest and subsequent conviction for resisting arrest, the history of MBC disciplinary proceedings against him, and the safety concerns of Defendant LaSota, based on Plaintiff's previous rude, uncooperative conduct at probation interviews, and the MBC's inability to confirm whether Plaintiff had complied with the terms of his criminal probation that required him not to own firearms.  As to Officer Tolen, the analysis necessarily turns on what he knew from the MBC records and other information that Tolen received from LaSota, and the credibility of his statements about the perceived risk that Plaintiff may have posed to himself or others on May 29, 2014.

In the Reply, Defendants argue that to the extent Plaintiff relies upon the post-arrest documentation to demonstrate that there was no probable cause for the Section 5150 detention, Plaintiff is mistaken.  (Reply at 7.)  Defendants point out the probable cause analysis is not limited to the contents of the post-arrest documentation but, rather, is based on "the totality of facts and circumstances known to the officer at the time of the arrest." (*Id.* (citing *Blankenhorn v. City of Orange*, 484 F.3d 463, 471 (9th Cir. 2007)); *Dean v. Fluty*, 231 F. Supp.3d 513, 519 (C.D. Cal. 2017)).  Even so, Defendants' own evidence raises factual disputes as to whether Plaintiff's behavior at the time of arrest objectively supported probable cause for a Section 5150 detention.

Officer Tolen states that he based his determination that Plaintiff should be transported for psychiatric evaluation and his statements on the 5150 Application, in part, on the records of Plaintiff's MBC disciplinary proceedings and previous police reports concerning the 2011 altercation at Plaintiff's home.  (Tolen Decl. at ¶ 22.)  Plaintiff contends, however, that those records also contained information that contradicts Officer Tolen's statements on the 5150 Application and, if Tolen reviewed those materials (as he indicates that he did), he should have been aware that information he wrote on the 5150 Application was false and there was not probable cause for detaining Plaintiff for psychiatric evaluation.  (Markman Decl. at ¶¶ 14-21.)  Thus, there is a factual dispute as to what Tolen actually knew (or did not know) about Plaintiff's prior MBC and Superior Court proceedings.  The parties also dispute whether Plaintiff's actual behavior on May 29, 2014 was sufficient to provide probable cause to transport Plaintiff for a Section 5150 psychiatric evaluation.

The undisputed evidence indicates that Plaintiff appeared for the probation interview dressed inappropriately on May 29, 2014.  Although LaSota says that Plaintiff's "behavior appeared irrational to me," she admits that she "did not speak with [Plaintiff] when we met in the Medical Board office's lobby" because "Ms. Eckhoff had not established that it was safe for the interview."  (LaSota Decl. at ¶ 18.)  LaSota does not describe any circumstances or articulable facts that suggested Plaintiff posed a safety threat at that time.  There is no evidence before the Court that Plaintiff was disruptive, combative, or in any way violent in his interactions with either the MBC personnel or law enforcement officers who later appeared on the scene.  Officer Waughan states that he thought Plaintiff's "thinking seemed irrational . . . because he did not appear to understand that going to a government office or public place wearing only his underwear was not appropriate conduct" (Waughan Decl. at ¶ 7), but there is no evidence  that Plaintiff was incoherent or in any way aggressive in his contact with Sergeant Waughan.  To the contrary, all of the evidence indicates that Plaintiff

33

1    cooperated fully with law enforcement officers from the time he was detained in the parking

2    lot right to when he was transferred to the custody of College Hospital for the 5150 hold.

3

4         It is undisputed that LaSota had concerns prior to the May 29 probation interview

5    about the safety of MBC personnel because she was unable to ascertain whether Plaintiff had

6    transferred his firearms as required by the terms of his criminal probation.  (LaSota Decl. at

7    ¶¶ 6.)  She asked Officer Tolen for CHP presence for the scheduled probation interview.  (*Id.*

8    at ¶¶ 12-13.)  Her request was denied. (*Id.* at ¶13.)  LaSota's affidavit in support of the

9    Motion does not describe any violent behavior by Plaintiff in her presence.  Instead, she

10   states that on previous occasions Plaintiff was "rude and uncooperative during the frisking

11   process" (*id.* ¶ 10) and demonstrated what LaSota describes as "hostile behavior and

12   negative attitude while being frisked and during his probation interview on March 25, 2014"

13   (*id.* at ¶ 11).

14

15        Officer Tolen found Plaintiff's appearance to be disheveled and his hair "messy" but

16   Plaintiff's conduct on May 29, 2014 did not objectively indicate that Plaintiff "had a mental

17   disorder" or that he posed "a danger to himself for others," or that he was "gravely

18   disabled."  Indeed, Officer Tolen states that despite his disheveled appearance, "[h]e was

19   physically calm, but his facial expression indicated to me that he was upset." (Tolen Decl. at

20   ¶ 13.)  Another fact raising a dispute as to whether Plaintiff evidenced a mental disorder or

21   posed grave danger to himself or others at the time is that, according to Officer Waughan,

22   the law enforcement personnel on the scene were unsure how to proceed.  (Waughan Decl. at

23   ¶ 12.)  The Sheriff's deputies, Waughan states, thought Plaintiff should be merely arrested

24   for indecent exposure.  (*Id.*)  Drawing all reasonable inferences in Plaintiff's favor, the

25   officers' uncertainty about what to do in the situation does not indicate that Plaintiff posed a

26   public safety threat or that he showed signs of likely self-harm.

27

28

                                                34

1    Plaintiff also challenges the veracity of statements Tolen made in completing the

2   5150 Application.  Officer Tolen was aware that the Medical Board had launched a new

3   accusation against Plaintiff, which had a Cause for Discipline for Mental Incompetence

4   Based on Mental Illness (*see* SUF ¶¶ 22, 68; LaSota Decl. at ¶ 8) and Defendants argue that

5   Plaintiff's behavior on May 29, 2014, "was supportive of this accusation to a lay person."

6   (Motion at 11.)   However, Defendants present no evidence demonstrating that Plaintiff's

7   behavior supported the accusation.  Plaintiff's behavior may have been eccentric and his

8   dress inappropriate, but the record before this Court contains no evidence to support an

9   inference that on May 29, 2014, he posed a threat to himself or anyone else by appearing for

10   the probation interview in his underwear.

11

12    Moreover, to the extent that Officer Tolen relies on Plaintiff's prior criminal history

13   to support his decision to detain Plaintiff under Section 5150, Plaintiff points to the records

14   of the MBC disciplinary proceedings that LaSota provided to Officer Tolen, which indicate

15   that:  Plaintiff was never charged with battery on police officers; never made criminal threats

16   against police officers during the 2011 altercation at his home; and did not have a history of

17   violence or mental illness.  (*See* Markman Decl. at ¶ 14; Ex. L.)  Defendant, in the Reply,

18   maintains  that Plaintiff's argument that he was never charged with battery misses the point

19   because Officer Tolen was aware that Plaintiff had been in an altercation with police and that

20   awareness itself was adequate to support probable cause to conclude that Plaintiff posed a

21   danger that warranted detention under section 5150.  (Reply at 10, n.7.)  This too is a factual

22   dispute.

23

24    Viewing the facts in the light most favorable to the Plaintiff, there are disputed

25   material facts as to whether there was probable cause to detain Plaintiff pursuant to Section

26   5150 sufficient to preclude granting summary judgment to Officer Tolen.  The credibility

27   determination(s) necessary to resolve whether Officer Tolen had probable cause to seize

28   Plaintiff for psychiatric evaluation, is properly the province of the jury.

1

2

### 5. Qualified Immunity

3       Defendant Tolen argues that even if he lacked probable cause for the Section 5150

4  detention, he is nonetheless entitled to summary judgment based on qualified immunity.[10]

5  An officer who makes an arrest without probable cause may be entitled to qualified

6  immunity if he reasonably believed there was probable cause.  *See Ramirez v. City of Buena*

7  *Park*, 560 F.3d 1012, 1024 (9th Cir. 2009).

8

9       The United States Supreme Court has defined the qualified immunity doctrine as

10  follows:

11

12       The doctrine of qualified immunity protects government officials from liability

13       for civil damages insofar as their conduct does not violate clearly established

14       statutory or constitutional rights of which a reasonable person would have

15       known.  Qualified immunity balances two important interests – the need to hold

16       public officials accountable when they exercise power irresponsibly and the

17       need to shield officials from harassment, distraction, and liability when they

18       perform their duties reasonably.  The protection of qualified immunity applies

19       regardless of whether the government official's error is a mistake of law, a

20       mistake of fact, or a mistake based on mixed questions of law and fact.

21

22  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal citations and quotation marks

23  omitted).  The High Court has also noted that "[b]ecause qualified immunity is "an immunity

24  from suit rather than a mere defense to liability . . . it is effectively lost if a case is

25

26  [10]     Officer Tolen acknowledges that he did not raise qualified immunity in the Motion.  However, in the Opposition,
    Plaintiff argued that Officer Tolen is not entitled to qualified immunity on the wrongful seizure claim.  (*See* Opposition at

27  17-20.)   Therefore, consistent with the Supreme Court's direction in *Pearson* that qualified immunity should be
    considered at the earliest possible stage in the litigation, this Court exercises its discretion to consider Tolen's arguments
    concerning the applicability of qualified immunity first raised in the Reply. *See Pearson*, 555 U.S. at 231; *Lane v. DOI*,

28  523 F.3d 1128, 1140 (9th Cir. 2008); *and see* Reply at 2-3, n. 6.

1    erroneously permitted to go to trial." *Id.* at 232 (quoting *Mitchell v. Forsyth*, 474 U.S. 511,

2    526 (1985)).  Thus, the Supreme Court has "repeatedly stressed the importance of resolving

3    immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S.

4    224, 227 (1991) (per curiam).

5

6           To withstand a defendant's assertion of qualified immunity, a plaintiff must show that:

7    (1) the official's conduct violated a constitutional right; and (2) the right was "clearly

8    established" at the time of the officer's conduct.  *Nelson v. City of Davis,* 685 F.3d 867, 875

9    (9th Cir. 2012 (citing *Harlow v. Fitzgerald*, 457 U.S. U.S. 800, 818 (1982)).  Further, "[t]he

10   determination whether a right was clearly established 'must be undertaken in light of the

11   specific context of the case, not as a broad proposition.'" *Nelson,* 685 F.3d at 883 (quoting

12   *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  Courts may exercise their sound discretion in

13   deciding which of the two prongs should be addressed first in light of the circumstances in

14   the particular case.  *Pearson,* 555 U.S. at 242 ("Because the two-step *Saucier* procedure is

15   often, but not always, advantageous, [federal judges] are in the best position to determine the

16   order of decision making that will best facilitate the fair and efficient disposition of each

17   case.").  Regardless of which factor is addressed first, "[t]he linchpin of qualified immunity

18   is the reasonableness of the official's conduct."  *Rosenbaum v. Washoe Cty.,* 663 F.3d 1071,

19   1075 (9th Cir. 2011) (citing *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987).)

20

21          Plaintiff argues that Tolen is not entitled to qualified immunity because "his behavior

22   was objectively unreasonable" and "he broke the law by knowingly communicating false

23   information about Plaintiff resulting in a violation of Plaintiff's Fourth Amendment rights."

24   (Opposition at 17.)  Plaintiff contends that Tolen could not rely on historical information to

25   provide probable cause for a 5150 hold because Plaintiff had never been diagnosed with a

26   mental disorder and Tolen "did not articulate behavioral symptoms of a mental disorder" that

27   Plaintiff demonstrated at the time of the detention.  (*Id.* at 18.)  Plaintiff also asserts that

28   LaSota's "investigation into the status of [Plaintiff's] firearms was contrived" and, therefore,

1    could not provide a basis for probable cause.  (*Id.* at 19.)  Plaintiff's assertions, however, are

2    not supported by admissible evidence.

3

4          Plaintiff provides no evidence that Lee Nguyen and LaSota knew about the purported

5    transfer of Plaintiff's firearms.  LaSota's affidavit states that prior to Plaintiff's probation

6    interview scheduled for May 2014, she could not find any information in the law

7    enforcement databases indicating that Plaintiff had transferred or sold his weapons.  (SUF ¶

8    45; LaSota Decl. at ¶ 11.)  The supposed declaration that Plaintiff says he provided to the

9    California state court confirming that he transferred his firearms to his daughter and she

10    removed them from their residence, is not part of the evidence here.  (*See* Defendants'

11    Objections to Declaration of Robert Markman, at 2 [Dkt. No. 117-1].)  Consequently,

12    Plaintiff's contention that LaSota (and therefore, Tolen) should have known that LaSota's

13    concerns about the status of Plaintiff's firearms were "contrived" is wholly unsupported.

14

15          Turning now to the *Saucier* factors, it is beyond dispute that the constitutional right to

16    be free from seizure without probable cause is clearly established such that detention without

17    probable cause violates the Fourth and Fourteenth Amendments and may give rise to a claim

18    under section 1983.  Defendants emphasize that to satisfy the "clearly established right"

19    prong of the qualified immunity standard, the right cannot be stated in broad generalities.

20    (Reply at 11 (*citing, inter alia, White v. Pauly*, __U.S.__, 137 S. Ct. 548, 551 (2017).)

21    However, the U.S. Supreme Court has noted that "in [some] instances a general

22    constitutional rule already identified in the decisional law may apply with obvious clarity to

23    the specific conduct in question, even though the very action in question has not previously

24    been held unlawful."  *United States v. Lanier*, 520 U.S. 259, 271 (1997).  The *Lanier*

25    analysis is relevant here where both the Fourth Amendment and Section 5150 plainly require

26    probable cause to make Plaintiff's seizure and detention lawful.  The relevant inquiry then is

27    whether a reasonable officer would have *believed* he had probable cause to detain Plaintiff

28    for psychiatric evaluation pursuant to Section 5150 under the circumstances, and, therefore,

reasonably believed his conduct was lawful. *See Anderson,* 483 U.S. at 641 (law enforcement officials who reasonably but mistakenly conclude probable cause is present should not be held personally liable if they reasonably believe conduct to be lawful).

Tolen contends that his decision to detain Plaintiff pursuant to Section 5150 was reasonable because:  Plaintiff appeared dressed only in his underwear for the probation interview; Plaintiff's appearance was messy and disheveled; LaSota had expressed concerns about Plaintiff's uncooperative and rude behavior at prior probation interviews; and LaSota could not confirm that Plaintiff had complied with the terms of his criminal probation to not possess firearms.  Tolen also argues that the historical information LaSota provided to him about Plaintiff's disciplinary proceedings before the MBC concerning Plaintiff treatment of his adult daughter's chronic pelvic pain with in-home propofol injections provided additional support for the reasonableness of his decision.

To establish probable cause to detain a person, who as a result of mental disorder, is a danger to others, or to himself or herself, under Section 5150 the officer must point to specific an articulable facts which, taken together with rational inferences from those facts, reasonably warrant his or her belief or suspicion.  *See, e.g., Bias,* 508 F.3d at 1216-1217 (officer entitled to summary judgment based on  qualified immunity for Section 5150 detention where plaintiff had threatened to kill herself; appeared "depressed and emotional"; expressed paranoia about an "Arab terrorist"; and "became increasingly agitated and visibly angry").  Here, as noted above, the Court finds that Plaintiff's conduct at the time of his arrest did not objectively satisfy the standard for detention under Section 5150.  The undisputed facts are that on May 29, 2014, other than showing up for the probation interview wearing underwear (which he had already alerted MBC personnel he might do to avoid aggravating his left shoulder during a weapons search), Plaintiff did not display overt behavior that suggested a mental disorder.  Plaintiff also did not act in a volatile, violent, or otherwise aggressive manner toward either MBC personnel or law enforcement officers.

Officer Tolen himself described Plaintiff as "physically calm" but with an upset facial expression.  (Tolen Decl. at ¶ 13.)  None of the law enforcement officers on the scene report that Plaintiff made any threats against himself or others.  In fact, the Sheriff's deputies thought Plaintiff should be merely arrested for indecent exposure.  (Waughan Decl. at ¶ 12.)  Throughout the encounter, Plaintiff was coherent and rational.  When he tensed his arm and spun around as Officer Keene attempted to position Plaintiff's arms for handcuffing, Plaintiff explained his prior injury and his concern not to be hurt.  Officer Tolen was aware that Plaintiff had been in an altercation with police officers in 2011 that resulted in an arrest, but there is no evidence before the Court to indicate that Plaintiff's conduct posed any threat of an altercation with law enforcement officers on May 29, 2014 — some three years after the altercation at his home.

In the Reply, Tolen further argues that the fact that Dr. Salo at College Hospital Cerritos subsequently and independently made a determination to hold Plaintiff for the full 72-hours for mental evaluation demonstrates the reasonableness of Tolen's decision to detain Plaintiff.  (*See* Reply at 6; Declaration of Clint Salo at ¶¶ 7-11.)  However, qualified immunity is analyzed based on information the officer possessed at the time of the officer's action and Tolen concedes as much in the Reply.  (Reply at 7.)  Accordingly, the *ex post* justification pointed to here is not sufficient to support a finding of qualified immunity.

Nevertheless, in addition to the facts outlined above, Officer Tolen also knew that: (1) well before the May probation interview LaSota had expressed concerns that Plaintiff might pose a threat to the safety of MBC personnel; (2) Plaintiff owned multiple firearms; (3) Plaintiff was on probation, which did not permit him to own weapons; (4) MBC personnel had been unable to confirm whether Plaintiff had complied with the conditions of his criminal probation to not possess weapons; and (5) Plaintiff was subject to a pending MBC disciplinary proceeding that asserted a Cause for Discipline against Plaintiff for alleged mental incompetence.  For these reasons, the Court concludes that while Tolen may

have been mistaken about whether he had probable cause to detain Plaintiff and mistaken about some of the contents of the MBC files that LaSota provided to him, based on the information at the time, he could have reasonably believed that his decision to detain Plaintiff under Section 5150 was lawful.  *See Anderson*, 463 U.S. at 541; *ActUp!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993) (determination of whether facts support defendant officer's reasonable belief that his conduct was lawful is a question of law for the court). Even viewing the facts in the light most favorable to Plaintiff, a reasonable officer presented with the circumstances presented to Officer Tolen at the time of Plaintiff's detention could have believed that probable cause existed for a Section 5150 hold and, therefore, that Plaintiff's detention was lawful.   Accordingly, Officer Tolen is entitled to qualified immunity from liability for damages under Section 1983 and summary judgment should be GRANTED as to Officer Tolen on Plaintiff's First Claim.

## II.   Excessive Force Pursuant to 42 U.S.C. Section 1983 as to Defendants Keene and Tolen (Third Claim)

CHP Officer Keene and CHP Officer Tolen move for summary judgment on Plaintiff's Third Claim for deprivation of constitutional rights pursuant to 42 U.S.C. § 1983 based on Defendants' use of excessive force.  (Motion at 15-18.)  Plaintiff contends that the officers used excessive force against him in violation of his rights under the Fourth and Fourteenth Amendments when:  (1) they handcuffed Plaintiff with his hands behind his back despite being told that Plaintiff had an injury that made it painful for him to put his arms in that position; and (2) Officer Tolen threatened to "Tase" Plaintiff if he did not allow the officers to move his arms into position to be handcuffed.  (*See* SAC at ¶¶ 53-56.)

\\
\\
\\
\\

1

2

### A. Legal Standard

3      "Fourth Amendment claims of excessive or deadly force are analyzed under an

4  objective reasonableness standard." *Espinosa v. City & Cnty. of San Francisco,* 598 F.3d

5  528, 537 (9th Cir. 2010) (citing *Scott v. Harris*, 550 U.S. 372, 381 (2007)).  In evaluating a

6  Fourth Amendment claim of excessive force, the court must ask "whether the officers'

7  actions are 'objectively unreasonable' in light of the facts and circumstances confronting

8  them" based on the totality of the circumstances." *Glenn v. Washington Cnty.,* 673 F.3d 864,

9  871 (9th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  The analysis

10  "requires a careful balancing of the nature and quality of the intrusion on the individual's

11  Fourth Amendment interests against the countervailing governmental interest a stake."

12  *Glenn*, 673 F.3d at 871 (quoting *Graham,* 490 U.S. at 396).  It is a "highly fact-intensive"

13  inquiry that involves no per se rules.  *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th

14  Cir. 2011).   "[P]olice officers are often forced to make split-second judgments – in

15  circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that

16  is necessary in a particular situation." *Glenn,* 673 F.3d at 871 (internal citation and

17  quotation marks omitted).  "Reasonableness therefore must be judged from the perspective

18  of a reasonable officer on the scene, 'rather than with the 20/20 vision of hindsight.'" *Glenn,*

19  673 F.3d at 871 (quoting *Graham*, 490 U.S. at 396).

20

21      The analysis involves three steps.  First, the Court "must assess the severity of the

22  intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount

23  of force inflicted.'" *Espinosa* F.3d at 537 (internal quotations marks omitted).  Second, the

24  Court must evaluate the government's interest by considering the factors the Supreme Court

25  identified in *Graham*:  "(1) the severity of the crime; (2) whether the suspect posed an

26  immediate threat to the officers' or public safety' and (3) whether the suspect was resisting

27  arrest or attempting to escape." *Id*.  Third, the Court must "balance the gravity of the

28  intrusion on the individual against the government's need for that intrusion." *Id.* (quoting

1    *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003)).  In other words, the Court "must

2    balance the force that was used by the officers against the need for such force to determine

3    whether the force used was 'greater than is reasonable under the circumstances.'"  *Id.*

4    (quoting *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002)).

5

6        The Ninth Circuit has held that "[b]ecause the reasonableness standard 'nearly always

7    requires a jury to sift through disputed factual contentions, and to draw inferences therefrom,

8    . . . summary judgment or judgment as a matter of law in excessive force cases should be

9    granted sparingly."  *Torres,* 648 F.3d at 1125 (quoting *Santos,* 287 F.3d at 853).  "This is

10   because such cases almost always turn on a jury's credibility determinations."  *Smith*, 394

11   F.3d at 701.  In addition, as Defendants correctly point out, because the factual inquiries as

12   to excessive force and unreasonable seizure are distinct, establishing a lack of probable

13   cause to make a seizure does not per se establish an excessive force claim or vice versa.

14   *Velanzquez v. City of Long Beach*, 793 F.3d 1010, 1024 (9th Cir. 2015).

15

16       **B. Analysis**

17

18        Plaintiff contends in the Second Amended Complaint that Officers Tolen and Keene

19   used excessive force against him in violation of the Constitution when:  (1) they handcuffed

20   Plaintiff for transport to College Hospital Cerritos despite the their knowledge that Plaintiff

21   had sustained a left shoulder injury; and (2) Officer Tolen threatened to "Tase" Plaintiff if he

22   did not relax his arm and so that he could be handcuffed.  However, Plaintiff has offered no

23   evidence or argument regarding excessive force in his Opposition to the Motion.  (*See*

24   Opposition at 1-19.)  Indeed, Plaintiff does not mention his excessive force claims in the

25   Opposition.  By failing to offer any evidence in opposition to the Motion on this claim,

26   Plaintiff has failed to establish the existence of a genuine factual dispute.[11]

27   ────────────────────

28   [11]       In the Reply Defendant Tolen argues that by failing to address the claim, Plaintiff "waives all arguments in
     opposition and consents to summary judgment for Tolen on these claims."  (Reply at 1.)  However, several cases

1    Consequently, the uncontradicted evidence establishes that Officer Tolen and Keene
2    acted in an objectively reasonable manner when they handcuffed Plaintiff on May 29, 2014.
3    With respect to the first factor, severity of intrusion, the evidence indicates that any intrusion
4    on Plaintiff was slight at best.   Keene told Plaintiff to stand up and turn around, which
5    Plaintiff did, "when Officer Tolen took [Plaintiff's] right arm and put the hand behind
6    [Plaintiff's] back, [Plaintiff] spun around toward Officer Tolen."   (Keene Decl. at ¶ 9.)
7    Plaintiff "then held his left arm rigidly against his body" resisting Officer Keene's ability to
8    move it for handcuffing.   (*Id.*)   Plaintiff explained that his left shoulder was injured, and
9    Keene responded by asking if the officers could carefully move Plaintiff's arm.   (*Id.*)
10   Plaintiff eventually relaxed his arm, and, to avoid hurting Plaintiff's left shoulder, Officers
11   Tolen and Keene were able to handcuff Plaintiff behind his back rather than above his head.
12   (*Id.; and see* Tolen Decl. ¶ 17*; SUF ¶¶ 58-62.)   Keene also states that, "while I was moving
13   [Plaintiff's] left arm for handcuffing, I was asking [Plaintiff] if it was hurting, and he was
14   saying no."   (Keene Decl. at ¶ 9.)   Finally, Defendants note that the video of the encounter
15   shows that the officers carefully directed Plaintiff into the front passenger seat of the CHP
16   patrol vehicle.   (Motion at 16; Keene Decl. at ¶ 10; Garcia Decl. at ¶ 4, Ex. A; Ostrick Decl.
17   at ¶ 6; SUF ¶ 62.)

18

19   The undisputed evidence also shows that the second factor – the government's
20   interest – supports the reasonableness of handcuffing Plaintiff under the circumstances.
21   Defendants Keene and Tolen explain that once the decision was made to transport Plaintiff
22   to the hospital for a psychiatric evaluation, handcuffing was necessary "for officer safety
23   during the transportation process" because the patrol car did not have a cage, screen or other
24   mechanism to separate the front seat from the rear seat and the handcuffing was consistent
25   with CHP policy and practices.   (Keene Decl. at ¶ 8; Tolen Decl. at ¶ 16.)   Finally, as noted

26

27   Defendants cited in support of this position involved motions to dismiss rather than motions for summary judgment.
     More importantly, the Court May not grant a motion for summary judgment simply because the nonmoving pro se party
     does not file opposing material, even if the failure to oppose violates a local rule."   *See Martinez v. Stanford*, 323 F.3d
28   1178 (9th Cir. 2003); Central District L.R. 7-13.

1    above, Plaintiff offers no evidence that he was injured or requested medical assistance
2    because of the handcuffing.  Thus, there is no genuine issue of material fact in dispute as to
3    whether Defendants used excessive force in handcuffing Plaintiff.

4

5    With regards to Plaintiff's contention that Officer Tolen threatened to tase him,
6    Plaintiff offers no factual or legal support for his contention that a law enforcement officer's
7    mere threat to use a Taser on an individual during an arrest violates a constitutional right.
8    Moreover, in an analogous case, the Ninth Circuit found that a prison guard's threat to use a
9    Taser when an inmate refused to submit to a strip search was not unconstitutional.
10   *Michenfelder v. Sumner*, 860 F.2d 328, 334-36 (9th Cir. 1988).  Finally, Plaintiff does not
11   dispute that he was never actually tased or that Officer Tolen kept his Taser in its holster.
12   (*See* Tolen Decl. at ¶ 17; *see also generally* Opposition.)

13

14   Thus, with respect to the actual force deployed against Plaintiff, the undisputed facts
15   are similar to those in other cases where no excessive force has been found and summary
16   judgment has been granted.  *See, e.g., Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d
17   912, 921-22 (9th Cir. 2001) (summary judgment granted on excessive force claim where
18   plaintiff stiffened her arm and attempted to pull free while being handcuffed); *Han v. City of
19   Los Angeles*, No. CV 14-08582 DDP (AJWx), 2016 WL 2758241, at *2, 8 (C.D. Cal. May
20   12, 2016) (no evidence of excessive force where plaintiff informed security guards and
21   officers of "preexisting shoulder injury that was causing him pain based on the handcuffs
22   being tight behind his back," but officers did nothing to alleviate the pain).  Therefore, there
23   is no question of fact as to whether the force used by Officers Tolen and Keene was
24   excessive, and the Motion should be GRANTED as to Officers Tolen and Keene on
25   Plaintiff's Claim Three for excessive force.  Further, because the Motion is granted with
26   respect to Plaintiff's claims for excessive force, the Court declines to consider whether
27   Officers Tolen and Keene would be entitled to qualified immunity on these claims.

28

45

**III.     Summary Judgment is Warranted On Plaintiff's Conspiracy Claim Against All Defendants (Second Claim)**

In his Second Claim of the SAC, Plaintiff alleges that all Defendants conspired to violate Plaintiff's Fourth and Fourteenth Amendment rights under Section 1983.  (*See* SAC ¶¶ 50-52.)   Specifically, Plaintiff asserts that Defendants conspired to unlawfully seize Plaintiff pursuant to Section 5150.  (*Id. at* ¶ 51.)   Defendants move for summary judgment on this claim, arguing that the claim is derivative of Plaintiff's First Claim.  (Motion at 19-20.)

**A. Legal Standard**

To establish liability for a conspiracy, Plaintiff must "demonstrate the existence of an agreement or meeting of the minds to violate constitutional rights."  *Mendocino Envtl. Ctr. v. Mendocino Cty,* 192 F.3d 1283, 1301 (9th Cir. 1999) (internal citation and quotation marks omitted).  Defendants must have, "by some concerted action, intend[ed] to accomplish some unlawful objective for the purpose of harming another which results in damages."  *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999). (internal citation omitted).  The agreement "need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendant."  *Id.*  "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy"  *United Steelworkers of Am. v. Phelps Dodge Corp*, 865 F.2d 1539, 1541 (9th Cir. 1989) (en banc).

**B. Analysis**

Although this Second Claim is alleged against "all Defendants", the SAC does not explain how any defendant other than LaSota and Tolen participated in this conspiracy.  (*See generally* SAC ¶¶ 50-52.)  With respect to LaSota and Tolen, however, Plaintiff asserts that

46

1    "[w]hen Tolen and LaSota met in the weeks before the incident, they conspired together to
2    have Tolen show up at the probation office on May 29, 2014 while the plaintiff would be
3    attending his scheduled quarterly probation interview for the express purpose of detaining
4    the plaintiff for a 5150 hold."  (SAC ¶ 51.)

5

6        To avoid summary judgment, Plaintiff must demonstrate that there are disputed issues
7    of fact that should be resolved by the jury.  However, Plaintiff fails to put provide any
8    admissible evidence demonstrating an agreement among LaSota and Tolen, much less all
9    Defendants, to unlawfully detain or harm Plaintiff.  To the contrary, the Opposition does not
10   discuss or even refer to the conspiracy claim.  When a party fails to present any evidence to
11   support their claims, the Court has no duty to search for evidence that would create a factual
12   dispute. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001.)

13

14       Moreover, the undisputed evidence before the Court contradicts Plaintiff's assertions
15   of a prior agreement between Tolen and LaSota to effectuate Plaintiff's detention.  It is
16   undisputed that Tolen met with LaSota in April 2014 to discuss Plaintiff's probation
17   interview scheduled for May 13, 2014.  (SUF ¶ 27; LaSota Decl. at ¶ 12; Tolen Decl. at ¶ 5.)
18   LaSota inquired about having CHP presence at Plaintiff's probation interview, but there is
19   no evidence that the meeting included any discussion about detaining Plaintiff.  (SUF ¶¶ 29-
20   30; LaSota Decl. at ¶¶ 12-13; Tolen Decl. at ¶¶ 7-8.)  Further, Tolen's affidavit states that he
21   did not know that Plaintiff was going to be at the MBC on May *29*, 2014 because Plaintiff's
22   probation interview had been originally scheduled for May *13*, 2014.  (Tolen  Decl. at ¶ 11.)

23

24       As to the other defendants, there is no evidence of any agreement reached to
25   unlawfully detain Plaintiff.  CHP Sergeant Waughan states that he independently
26   encountered Plaintiff in the MBC lobby as Plaintiff exited the elevator wearing his
27   underwear.  (SUF ¶ 38; Waughan Decl. at ¶ 5.)  Waughan then called the Sheriff's
28   Department because the lobby and parking lot of the MBC building are under the Sheriff

Department's jurisdiction.  (SUF ¶ 41; Waughan Decl. at ¶ 7.)  The evidence presented by Defendants indicates that it was after LaSota came down to the parking lot that Tolen, Keene, and Waughan discussed whether to take Plaintiff to a hospital under Section 5150 and Tolen ultimately decided that Plaintiff should be taken to a hospital.  (SUF ¶¶ 46-47, 51; Waughan Decl. at ¶ 14.)  LaSota and Keene did not participate in any decision regarding whether to take Plaintiff to a hospital under Section 5150.  (SUF ¶¶ 47, 49; LaSota Decl. at ¶ 22-23; Keene Decl. at ¶ 7.)  Further, LaSota states that neither she nor any of the MBC inspectors that she supervised called law enforcement to report Plaintiff on May 29, 2014. (SUF ¶¶  52, 53;  LaSota Decl. at ¶¶ 19, 20.)  Plaintiff offers no evidence contradicting these facts.

In the absence of any disputed issues of fact regarding the existence of a conspiracy, summary judgment should be GRANTED as to all Defendants with respect to Claim Two and Plaintiff's conspiracy claim should be dismissed.

## IV.   State Law Claims Against Defendants

Defendants also seek summary judgment on four state law causes of action asserted against all Defendants:   False Imprisonment (Fifth Claim); Negligence (Sixth Claim); Defamation (Seventh Claim); and Intentional Infliction of Emotional Distress (Eighth Claim).  (Motion at 20-25.)  As noted above, in opposing the Summary Judgment Motion, Plaintiff must submit some *proof*, in the form of admissible, documentary evidence that supports his claims and sets forth specific facts showing that there are genuine and material issues in dispute which require a trial.  *See Klingele v. Eikenberry*, 849 F.2d 409, 411-12 (9th Cir. 1988).

To avoid summary judgment, Plaintiff is required to present "significant probative evidence tending to support" his allegations.  *Gen. Bus. Sys. v. N. Am. Phillips Corp.*, 699

48

F.2d 965, 971 (9th Cir. 1983) (quoting *First Nat'l Bank of Ariz. V. Cities Serv. Co*., 391 U.S. 253, 290 (1968)).  Plaintiff's Opposition does not address or even mention the state law causes of action.  Because Plaintiff did not present any evidence in opposition to the Motion on these claims, he fails to demonstrate that there are disputed issues of material fact.  As the Supreme Court has emphasized, to demonstrate the existence of a genuine issue, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co*., 475 U.S. at 587.

By failing to address these claims in his Opposition, Plaintiff appears to have abandoned these claims.  Nonetheless, in an abundance of caution and in the interests of justice, the Court examines the record evidence as to each of the asserted tort claims.

### A. False Imprisonment (Fifth Claim)

Plaintiff alleges all Defendants should be held liable for having Plaintiff falsely imprisoned at College Hospital Cerritos based on the Section 5150 Application.  (*See* SAC ¶¶ 62-64.)  The elements of a false imprisonment cause of action are:  (1) the nonconsensual, intentional confinement of a person; (2) without lawful privilege; (3) for an appreciable length of time.  *Hagberg v. California Fed. Bank*, 32 Cal. 4th 350, 372-373 (2004).

The Opposition does not address the false imprisonment allegations against any Defendants.  In light of Plaintiff's *pro se* status, the Court must liberally construe Plaintiff's filing.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Nevertheless, on a motion for summary judgment, Plaintiff is not excused from presenting admissible evidence to show a triable issue of fact in opposition to the Motion.  *See Franklin v. Murphy*, 745 F.2d 1221, 1235 (9th Cir. 1984) (plaintiff must "present some significant probative evidence tending to support the complaint.") (internal citation omitted).  Because Plaintiff presents no probative evidence in support of this state law claim against any Defendants, summary judgment should be

1  GRANTED as to Defendants LaSota, Tolen, Keene, and Waughan on Plaintiff's Fifth Claim
2  for false imprisonment.

3

### C.  Negligence, Intentional Infliction of Emotional Distress, and Defamation

5

6  Plaintiff also alleges that Defendants are liable for negligence, intentional infliction of
7  emotional distress ("IIED"), and defamation.   The SAC alleges that Defendants were
8  negligent in asserting that Plaintiff needed evaluation for a mental disorder when the
9  documentation that LaSota provided to Officer Tolen contained no such determination, only
10 a still unproven Cause for Discipline by the MBC that alleged Plaintiff's mental
11 incompetence.   Plaintiff also alleges that Defendants' conduct in seizing him without
12 probable cause, handcuffing him in a manner that caused pain to his injured shoulder despite
13 having been told about Plaintiff's shoulder injury, and having him transported to a hospital
14 and placed under 5150 psychiatric hold.  But Plaintiff in opposing the Motion, Plaintiff does
15 not mention the tort claims and presents no probative evidence to create genuine disputed
16 issues as to the claims.   Unsupported allegations in the SAC are not sufficient to allow
17 Plaintiff's tort claims to go to a jury.

18

### 1.  Legal Standards

20

21 The elements of a claim for negligence under California law are:  (1) the defendant
22 owed the plaintiff a duty of care; (2) a breach of that duty; and (3) defendant's breach
23 proximately caused the plaintiff's injury.  *Musgrove v. Ambrose Properties*, 87 Cal.App.3d
24 44, 53 (1978).  "The question of duty, whether it exists and its scope, is one of law for the
25 court."  *Wright v. City of Los Angeles*, 219 Cal. App.3d 318, 326 (1990) (internal citation
26 omitted).

27

28

The elements of a claim for IIED are:  (1) extreme and outrageous conduct by Defendants with the intention, or reckless disregard of the probability, of causing emotional distress; (2) Plaintiff suffered severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by Defendants' outrageous conduct.  *See Corales v. Bennett*, 567 F.3d 554, 571 (9th Cir. 2009); *see also Hughes v. Pair*, 46 Cal. 4th 1035, 1052 (2009).  "Outrageous conduct" is conduct that is "so extreme as to exceed all bounds of that usually tolerated in a civilized community.'"  *Corales,* 567 F.3d at 571.  "Severe emotional distress" is "emotional distress of such substantial quality or enduring quality that no reasonable [person] in civil society should be expected to endure it."  *Hughes,* 46 Cal. 4th at 1051 (internal quotation marks omitted) ("discomfort, worry, anxiety, upset stomach, concern, and agitation" are not severe emotional distress) (citing *Potter v. Firestone Tire & Rubber Co*., 6 Cal 4th 965, 1004 (1993)).  A defendant must have intended to inflict injury or have "engaged in [the conduct] with the realization that injury will result."  *Wong v. Tai Jing*, 189 Cal. App. 4th 1354, 1377 (2010).  Therefore, to survive summary judgment, Plaintiff must present admissible evidence of specific facts "demonstrating the nature, extent or duration of [his] alleged emotional distress."  *Cf. Angie M. v. Sup. Ct.,* 37 Cal. App. 4th 1217, 1227 (1995).

The elements of a claim for defamation are:  (1) intentional publication of (2) a statement of fact that (3) is false (4) unprivileged, and (5) has a natural tendency to injure or which causes special damage.  *See Smith v. Maldonado*, 72 Cal.App.4th 637, 645 (1999).  To prevail on a defamation claim, like IIED, requires establishing state of mind, causation and injury.  *Alcorn v. Anbro Eng'g, Inc*., 2 Cal.3d 493, 497-98 (1970).

## 2.  Analysis

Plaintiff presents no probative evidence that creates a disputed fact as to any element of these tort claims with respect to LaSota, Keene and Waughan.  As discussed above, the

51

undisputed facts demonstrate that these defendants were not personally involved in the decision to detain Plaintiff pursuant to Section 5150 and did not make any statements to personnel at College Hospital Cerritos in connection with the Section 5150 Application for Plaintiff's psychiatric evaluation.  Further, Plaintiff fails to offer any probative evidence to create a disputed material issue with respect to any of these state law causes of action.  Accordingly, the Motion should be GRANTED as to Defendants LaSota, Keene, and Waughan on Plaintiff's Sixth (negligence), Seventh (Defamation), and Eighth (IIED) Claims.

Concerning Officer Tolen, Plaintiff's Opposition makes conclusory statements that Tolen's conduct fell below a standard of care.  (*See, e.g.,* Opposition at 10-11.)  For example, Plaintiff states "if Tolen had shown ordinary care and prudence in this case and had not been negligent he would have read the documents provided to him and known that none of what he wrote on the 5150 Application was true[]" and "Tolen had no interest in using ordinary care or prudence before checking off this box."  (Opposition at 10-11.)  However, Plaintiff's conclusory assertions are not supported by significant probative evidence and therefore fail to create a genuine dispute regarding the negligence cause of action asserted against Officer Tolen.  Furthermore, even if Plaintiff had presented evidence sufficient to create a disputed issue of facts as a duty owed to Plaintiff and a breach of that duty, Plaintiff wholly fails to present any evidence of damages proximately caused by any such breach.

With respect to Plaintiff's defamation claim, even liberally construing Plaintiff's assertions that statements Office Tolen made on the 5150 Application may have been false as evidence in support of the defamation claim, Plaintiff still cannot defeat summary judgment.  First, Plaintiff offers no probative evidence that Officer Tolen acted with the required malicious intent.  Second, even if Tolen's statements were false, there is no evidence, controverted or otherwise, in the record to suggest that Plaintiff suffered injury or

special damage.  Plaintiff acknowledges that he "had administered intravenous propofol to his daughter 500 times over 5 years" (Opposition at 7) and the records from his MBC proceedings and 2012 criminal conviction that were offered in support of the Motion show that in challenging the MBC disciplinary findings and his criminal conviction, Plaintiff submitted the documents related to those disciplinary and criminal proceedings in his own public filings in the California courts.  (*See* RJN Ex. 8.)  Thus, because Plaintiff presents no evidence beyond conclusory allegations, he cannot defeat summary judgment as to Officer Tolen on the negligence, IIED, and defamation claims, and summary judgment must be GRANTED to Defendant Tolen on all three claims.


## RECOMMENDATON


For all the foregoing reasons, IT IS HEREBY recommended that the District Judge issue an Order:  (1) accepting this Report and Recommendation; (2) GRANTING summary judgment in favor of Defendants LaSota, Keene, Tolen, and Waughan; and (3) directing that Judgment be entered dismissing this action with prejudice.


DATED: November 27, 2017

KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE


## NOTICE


Reports and Recommendations are not appealable to the Court of Appeals, but may be subject to the right of any party to file objections as provided in the Local Rules Governing the Duties of Magistrate Judges and review by the District Judge whose initials appear in the

1  docket number.  No notice of appeal pursuant to the Federal Rules of Appellate Procedure

2  should be filed until entry of the judgment of the District Court.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28